Howard Kaloogian, State Bar No. 118954
Lowell Robert Fuselier, State Bar No. 14070
David T. Hayek, State Bar No. 144116
Kaloogian & Fuselier LLP
2382 Faraday Avenue, Suite 130
Carlsbad, California 92008
Tel. 760-522-1802
Fax. 760-431-1116
**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT
## Southern District of California

| | |
|---|---|
| SAN DIEGO MINUTE MEN,<br><br>Plaintiff,<br><br>vs.<br><br>DALE BONNER in his Official Capacity as Agency Director, Business, Transportation and Housing Agency; WILL KEMPTON in his Official Capacity as CalTrans Director; PEDRO ORSO-DELGADO in his Official Capacity as Caltrans District Director and DOES 1 through 50,<br><br>Defendants. | Case Number: 08CV0210 WQH [RBB]<br><br>DECLARATION OF LOWELL ROBERT FUSELIER, ESQ. |

I, Lowell Robert Fuselier, declare as follows:

1. All of the facts set forth herein are within my personal knowledge; if called as a witness, I could and would testify competently thereto.

2. I am an attorney duly licensed to practice before this Court and represent Plaintiff San Diego Minutemen in the above-entitled matter.

3. As part of Plaintiff's initial filing in this action, Plaintiff filed *ex parte* for an Order for early discovery [Doc #3] seeking the depositions of Defendants Kempton and Orso-Delgado.

1

DECLARATION OF L. ROBERT FUSELIER, ESQ.

08CV0210 WQH (RBB)

1  4.      The Court (Mag. Brooks) Ordered the depositions to proceed [Doc #22].

2  5.      I took the deposition of Defendant William Alan Kempton on March 20, 2008.

3          Attached hereto as Exhibit 1 is a true and correct copy of portions of the transcript

4          of Mr. Kempton's Deposition..

5  I declare under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct.

7  EXECUTED this 24th day of April, 2008, at Carlsbad, California.

8

9                        /s/ Lowell Robert Fuselier

                           Lowell Robert Fuselier, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO MINUTE MEN,            )
                                 )
         PLAINTIFF,              )
                                 )
VS.                              )  CASE NO. 08CV0210 WQH
                                 )           (RBB)
DALE BONNER IN HIS OFFICIAL      )
CAPACITY AS AGENCY DIRECTOR,     )
BUSINESS, TRANSPORTATION AND     )
HOUSING AGENCY; WILL KEMPTON     )
IN HIS OFFICIAL CAPACITY AS      )
CALTRANS DIRECTOR; PEDRO         )
ORSO-DELGADO IN HIS OFFICIAL     )
CAPACITY AS CALTRANS DISTRICT    )
DIRECTOR AND DOES 1 THROUGH      )
50,                              )
         DEFENDANTS.             )
_____)


DEPOSITION OF WILLIAM ALAN KEMPTON
SAN DIEGO, CALIFORNIA
MARCH 20, 2008




REPORTED BY: TRACI A. TAYLOR, CSR NO. 10413

VAN DEUSEN REPORTING
(619) 287-0070 - FAX 287-3010


EXHIBIT 1, p.1

```
 1                WILLIAM ALAN KEMPTON,
 2   HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:
 3
 4                        EXAMINATION
 5   BY MR. FUSELIER:
 6        Q    GOOD MORNING, MR. KEMPTON.
 7        A    GOOD MORNING.
 8        Q    MY NAME IS BOB FUSELIER.  I'M AN ATTORNEY.  I
 9   REPRESENT THE SAN DIEGO MINUTEMEN IN AN ACTION PENDING
10   IN THE FEDERAL COURT.  WE'RE HERE TODAY TO TAKE YOUR
11   DEPOSITION.
12             IS THERE ANY REASON THAT WE SHOULD NOT
13   PROCEED WITH YOUR DEPOSITION TODAY?
14        A    NO.
15        Q    HAVE YOU EVER HAD YOUR DEPOSITION TAKEN
16   BEFORE?
17        A    YES.
18        Q    APPROXIMATELY HOW MANY TIMES?
19        A    I WOULD RECALL MAYBE TWICE ON CASES RELATED
20   TO TRANSPORTATION ISSUES IN SANTA CLARA COUNTY WHEN I
21   WAS THE EXECUTIVE DIRECTOR OF THE SANTA CLARA COUNTY
22   TRAFFIC AUTHORITY.
23        Q    HOW LONG AGO WAS THAT?
24        A    THAT OCCURRED IN THE TIME FRAME BETWEEN 1985
25   AND 1992.
```

```
1     A    HE DID.

2     Q    HOW DID HE DO THAT?

3     A    AGAIN, MY RECOLLECTION IS BY PHONE.
4  ALTHOUGH, THERE MAY HAVE BEEN SOME E-MAIL
5  CORRESPONDENCE, AS WELL.
6          MR. FUSELIER:  DID WE BRING ANY E-MAIL
7  CORRESPONDENCE?
8          MR. MUELLER:  WE DID.
9          MR. FUSELIER:  IS THERE ANY E-MAIL
10 CORRESPONDENCE RELATIVE TO THIS NOTIFICATION OF THE
11 COMPLAINTS BY SOMEONE WHO WAS UNHAPPY WITH THE SIGNAGE?
12         MR. MUELLER:  THERE IS.
13 BY MR. FUSELIER:
14    Q    WHAT WAS YOUR UNDERSTANDING OF THE
15 COMPLAINT?
16    A    MY UNDERSTANDING OF THE COMPLAINT WAS THAT
17 THERE WAS GREAT CONCERN ON THE PART OF THE COMPLAINANT
18 THAT A GROUP THAT WAS -- THAT WAS OPPOSED TO CERTAIN
19 IMMIGRATION POLICIES WOULD HAVE BEEN ISSUED A PERMIT TO
20 PICK UP LITTER ALONG A STATE HIGHWAY, PARTICULARLY A
21 STATE HIGHWAY IN THE VICINITY OF A BORDER INSPECTION
22 FACILITY WHERE THERE WOULD BE A GOOD DEAL OF
23 IMMIGRATION TRAFFIC.
24    Q    DID MR. DELGADO OFFER ANY OPINION TO YOU
25 ABOUT HIS POSITION ON THE MATTER?
```

1   ISSUE, FROM MY PERSPECTIVE, THAT WE HAD THE PROSPECTS
2   OF A CONFRONTATION THAT MIGHT OCCUR AT THAT LOCATION
3   BETWEEN THE FOLKS THAT WOULD ACTUALLY BE OUT THERE
4   CLEANING UP THE HIGHWAY UNDER THE PERMIT AND OTHER
5   INDIVIDUALS WHO MIGHT DISAGREE WITH THEM, THAT THERE
6   COULD BE POTENTIALLY A PROBLEM WITH PEOPLE TRAVELING BY
7   THE SITE, THROWING OBJECTS AT THE FOLKS ACTUALLY DOING
8   THE LITTER PICKUP, OR SOMEONE JUST STOPPING ALONG THE
9   ROADWAY, WHICH IS A DANGEROUS SITUATION IN AND OF
10  ITSELF, TO CUT DOWN A SIGN THAT HAD THE MINUTEMEN
11  ADOPTION LISTED ON IT.
12       Q   AND WHY DID YOU THINK THAT ANY OF THOSE
13  EVENTS MIGHT OCCUR?
14       A   WELL, I THINK THAT THE ISSUE OF IMMIGRATION
15  IS CERTAINLY, BY MOST REASONED CONSIDERATIONS, AN ISSUE
16  OF SOME CONTROVERSY IN THIS COUNTRY.  AND YOU -- WHEN
17  YOU HAVE ONE COMMUNITY THAT BECOMES PITTED AGAINST
18  ANOTHER COMMUNITY, WHATEVER THE REASON, CERTAINLY
19  CONFRONTATIONS FROM TIME TO TIME DO OCCUR.
20           AND THIS ISSUE OF THE MINUTEMEN'S CONCERN
21  ABOUT IMMIGRATION AND THE FACT THAT THERE WOULD BE
22  SIGNIFICANT TRAFFIC ALONG THAT CORRIDOR, INCLUDING
23  IMMIGRANT TRAFFIC, THAT THERE WAS A RISK OF THAT KIND
24  OF CONFRONTATION OCCURRING.
25       Q   WAS THIS A SUBJECTIVE CONCLUSION THAT YOU

1  CAME TO ON YOUR OWN?

2  A   I WOULD SAY, YES, IT WAS A SUBJECTIVE

3  CONCLUSION. AND I DID COME TO THAT CONCLUSION ON MY

4  OWN.

5  Q   OKAY. WAS IT YOUR DECISION TO MOVE THE

6  SIGN?

7  A   YES.

8  Q   WHAT CRITERIA DID YOU USE TO SELECT THE NEW

9  LOCATION?

10     MR. MUELLER: ASSUMES FACTS NOT IN

11  EVIDENCE.

12     THE WITNESS: PARDON ME?

13     MR. MUELLER: ASSUMES FACTS NOT IN EVIDENCE.

14  LACK OF FOUNDATION.

15  BY MR. FUSELIER:

16  Q   THIS IS ONE OF THOSE MOMENTS WHERE YOU ANSWER

17  ANYWAY.

18  A   SO I HAVE TO GO AHEAD AND ANSWER ANYWAY?

19     I DID NOT PERSONALLY USE ANY CRITERIA. IT

20  JUST SEEMED THAT WE NEEDED TO RELOCATE THAT SIGN TO A

21  LOCATION THAT WAS LESS SIGNIFICANT WITH RESPECT TO AN

22  IMMIGRATION FACILITY IN CLOSE PROXIMITY TO AN AREA OF

23  HIGHWAY ADOPTED BY THE MINUTEMEN GROUP.

24  Q   GOING BACK TO YOUR CONCERNS -- YOUR SAFETY

25  CONCERNS. WAS IT YOUR THOUGHT THAT THE NAME, SAN DIEGO

1   MINUTEMEN, ITSELF WAS GOING TO CAUSE PEOPLE TO HAVE AN
2   ADVERSE REACTION OF SOME SORT?
3       A   I DON'T BELIEVE IT WAS GOING TO CAUSE PEOPLE,
4   IN A GENERIC SENSE, TO HAVE AN ADVERSE REACTION.  I DID
5   FEEL THAT IT COULD CAUSE MEMBERS OF THE LATINO
6   COMMUNITY AND SOME OF THE FOLKS -- SOME OF THE
7   IMMIGRATION TRAFFIC, TO HAVE AN ADVERSE REACTION, YES.
8       Q   WHY DID YOU THINK THEY WOULD HAVE AN ADVERSE
9   REACTION TO THE NAME, SAN DIEGO MINUTEMEN?
10      A   AS I MENTIONED EARLIER AND STATED PREVIOUSLY,
11  IMMIGRATION IS AN ISSUE OF SOME CONTROVERSY IN THIS
12  COUNTRY.  THE MINUTEMEN HAVE BEEN AN ORGANIZATION THAT
13  HAVE BEEN OUTSPOKEN ABOUT THE ISSUE OF IMMIGRATION.
14  THE LATINO COMMUNITY THAT -- PARTICULARLY GROUPS
15  INVOLVED IN THAT ISSUE WOULD BE -- WOULD, IN MY VIEW,
16  HAVE SOME CONCERNS ABOUT --
17      Q   SO IN OTHER WORDS, WHEN THEY SEE THE NAME,
18  YOU BELIEVE THAT THOSE MEMBERS OF THE COMMUNITY THAT
19  YOU HAVE DESCRIBED WOULD REACT NEGATIVELY TO THE
20  MINUTEMEN'S POSITION ON IMMIGRATION; IS THAT FAIR?
21      A   STATE THE QUESTION AGAIN, PLEASE.
22          MR. FUSELIER:  I'LL JUST HAVE HER READ IT TO
23  YOU.  I DON'T KNOW THAT I CAN SAY THAT TWICE.
24          (RECORD READ:   "Q   SO IN OTHER WORDS,
25          WHEN THEY SEE THE NAME, YOU BELIEVE THAT

```
 1          THOSE MEMBERS OF THE COMMUNITY THAT YOU HAVE

 2          DESCRIBED WOULD REACT NEGATIVELY TO THE

 3          MINUTEMEN'S POSITION ON IMMIGRATION; IS THAT

 4          FAIR?")

 5      A   I THINK THAT'S FAIR.

 6  BY MR. FUSELIER:

 7      Q   AND THAT WAS THE UNDERLYING MOTIVATION FOR

 8  YOU TO MAKE THE DECISION YOU MADE ABOUT THE SIGN?

 9          MR. MUELLER:  OBJECTION.  VAGUE.

10      A   I'M TRYING TO JUDGE WHETHER HE'S MADE AN

11  OBJECTION.

12          NO, I DON'T THINK THAT'S THE UNDERLYING

13  MOTIVATION AS TO WHY I MADE THE DECISION.  THE

14  UNDERLYING MOTIVATION IN MAKING THE DECISION WAS AN

15  ISSUE OF SAFETY.  IT REALLY -- I MEAN, THE RELATIONSHIP

16  OF THE MINUTEMEN TO THE LATINO COMMUNITY IN THIS

17  INSTANCE WAS, OF COURSE, THE CONTROVERSY THAT I

18  FORESAW.  BUT THE UNDERLYING MOTIVATION WAS A QUESTION

19  OF SAFETY.

20  BY MR. FUSELIER:

21      Q   SO THAT I CAN BE CLEAR ON THIS NOW -- AND THE

22  QUESTION OF SAFETY ARISES BECAUSE OF THE POSSIBLE

23  ADVERSE REACTION BY MEMBERS OF THE LATINO COMMUNITY AND

24  OTHER GROUPS REACTING TO THE MESSAGE OF THE MINUTEMEN

25  AS TO THEIR POSITION ON IMMIGRATION; IS THAT FAIR?
```

1   A   THAT'S FAIR.

2   Q   THERE WERE SOME NEWS ARTICLES ABOUT YOU

3   MEETING WITH MEMBERS OF THE ASSEMBLY -- THE ASSEMBLY

4   AND THE SENATE RELATIVE TO THIS POINT.

5       ARE YOU FAMILIAR WITH THOSE ARTICLES?

6   A   DON'T RECALL SEEING ANY NEWS ARTICLES ABOUT

7   THE MEETING.

8   Q   PROBABLY A POOR CHOICE.

9   A   MAYBE SOME REFERENCES TO THEM.  I WOULD JUST

10  ADD THAT I REVIEW HUNDREDS OF MEDIA DOCUMENTS EVERY

11  DAY.

12  Q   I'LL BET.

13  A   ALL OF THE CLIPS.

14  Q   I'M SURE YOU DO.  I TRY TO AVOID THEM.

15      DID YOU REVIEW THE PLEADINGS IN THIS CASE?

16  A   NO.

17  Q   HAVE YOU SEEN ANY OF THE DOCUMENTS THAT HAVE

18  BEEN FILED IN THE FEDERAL COURT RELATIVE TO THIS

19  CASE?

20  A   I HAVE SEEN THEM.  I HAVE NOT READ THEM.

21  Q   HAVE YOU MET WITH MEMBERS OF THE ASSEMBLY AND

22  THE SENATE CONCERNING THIS MATTER?

23  A   YES.

24  Q   WHO HAVE YOU MET WITH?

25  A   I MET WITH REPRESENTATIVES OF THE LATINO

1    Q    NOW, THERE WAS A SUBSEQUENT DECISION THAT WAS
2    MADE TO REMOVE -- LET ME RESAY THAT. THERE WAS A
3    DECISION MADE TO REMOVE THAT SECTION OF THE ROADWAY,
4    THAT WOULD BE THE NORTHBOUND SECTION AT THE IMMIGRATION
5    CHECKPOINT, FROM THE ADOPT-A-HIGHWAY PROGRAM,
6    CORRECT?
7    A    YOU KNOW, I'M NOT CERTAIN THAT THAT DECISION
8    HAS BEEN MADE. IT WAS DISCUSSED. BUT I AM NOT AWARE
9    THAT WE HAVE REMOVED THAT SEGMENT FROM THE
10   ADOPT-A-HIGHWAY PROGRAM.
11   Q    IS IT YOUR INTENTION TO DO THAT?
12   A    IT IS NOT MY INTENTION TO DO THAT. IT WAS
13   DISCUSSED AS POTENTIALLY NOT THE BEST PLACE, FOR OTHER
14   REASONS, PROXIMITY TO SAN ONOFRE, THE BORDER INSPECTION
15   FACILITY WHICH OCCUPIES A PORTION OF IT; THAT MAYBE
16   THAT WAS A BETTER PLACE FOR CALTRANS FORCES TO DO THE
17   MAINTENANCE WORK THAN TO USE IT AS AN ADOPT-A-HIGHWAY
18   PROGRAM.
19        SO THAT -- I SUSPECT IT IS FAIR TO SAY. IT
20   STILL MAY BE UNDER CONSIDERATION. I AM NOT AWARE OF A
21   DECISION BEING MADE ON THAT POINT.
22   Q    SO, THEN, AS WE SIT HERE TODAY, THAT PART OF
23   THE HIGHWAY IS AVAILABLE FOR ANOTHER APPLICANT TO
24   REQUEST A PERMIT, ENCROACHMENT PERMIT TO ADOPT THAT
25   PART OF THE ROAD, AS WE SIT HERE NOW, CORRECT?

```
 1           MR. MUELLER:  CALLS FOR SPECULATION.
 2      A    IF IT HASN'T BEEN REMOVED FROM THE
 3  ADOPT-A-HIGHWAY ELIGIBLE SEGMENTS OF HIGHWAY, THEN IT
 4  WOULD STILL BE AVAILABLE.
 5  BY MR. FUSELIER:
 6      Q    WOULD YOU KNOW IF IT HAS BEEN REMOVED?  IS
 7  THAT SOMETHING THAT WOULD BE PASSED BY YOU, CONSIDERING
 8  THIS LITIGATION AND ALL THE THINGS THAT ARE GOING ON?
 9      A    YES, I WOULD EXPECT TO KNOW.  AND THE FACT
10  THAT I DON'T KNOW IS AN INDICATION TO ME THAT IT HAS
11  NOT BEEN REMOVED.
12      Q    DO YOU KNOW OF ANY -- LET ME ASK THIS
13  QUESTION.  IF IT WERE TO BE REMOVED, HOW WOULD THAT
14  PROCESS BE UNDERTAKEN?  WHAT'S THE PROCEDURE FOR
15  THAT?
16      A    IT WOULD SIMPLY BE DEEMED AN INELIGIBLE
17  ADOPT-A-HIGHWAY LOCATION.
18      Q    AND IS THAT WITHIN YOUR PURVIEW TO MAKE THAT
19  DETERMINATION?
20      A    YES.
21      Q    ANYBODY ELSE'S PURVIEW?
22      A    I WOULD TRUST A DISTRICT DIRECTOR, SUCH AS
23  MR. PEDRO ORSO-DELGADO, TO MAKE THAT JUDGMENT.  I WOULD
24  TRUST LITERALLY OUR DEPUTY FOR MAINTENANCE AND
25  OPERATIONS TO MAKE THAT JUDGMENT.
```

1    Q    DID YOU MAKE ANY ATTEMPT TO CONTACT ANYONE IN
2 THE ORGANIZATION, LIKE THE MAN THAT IS LISTED ON THE
3 PERMIT?
4    A    NO.
5    Q    DO YOU KNOW -- OKAY.
6         IF THE PERMIT IS SITE SPECIFIC AND TIME
7 SPECIFIC, HOW -- WHAT ADMINISTRATIVE PROCEDURES ARE
8 USED TO CHANGE THE LOCATION ON THIS PERMIT THAT'S
9 ALREADY ISSUED WITHOUT REVOKING IT?
10   A    MAYBE I CAN BEST ANSWER THAT QUESTION BY
11 GIVING YOU AN EXAMPLE.  MOST OF THE TIME PERMITS OF
12 THIS NATURE ARE REVOKED FOR REASONS OF NONPERFORMANCE.
13 THERE IS A REQUIREMENT THAT THE GROUP EITHER HIRE
14 SOMEONE TO COME IN AND CLEAN THE ROADWAY OR PERFORM
15 THAT SERVICE THEMSELVES AFTER RECEIVING TRAINING.  I
16 BELIEVE THE FREQUENCY IS TWICE A MONTH.
17        AND IF AN AGENCY OR AN ORGANIZATION THAT HAS
18 BEEN GRANTED A PERMIT DOES NOT FULFILL THAT
19 RESPONSIBILITY, THEN WE WILL REVOKE THE PERMIT.
20   Q    OKAY.  BUT IN THIS CASE YOU DIDN'T REVOKE THE
21 PERMIT, DID YOU?  OR DID YOU REVOKE IT?  I DON'T KNOW.
22   A    TECHNICALLY, THAT EXISTING PERMIT WAS
23 REVOKED.
24   Q    OKAY.
25   A    BECAUSE WE FOUND ANOTHER LOCATION AT WHICH A

1   NEW PERMIT WOULD HAVE BEEN ISSUED HAD THE ORGANIZATION

2   BEEN WILLING TO ACCEPT THAT.

3       Q   ALL RIGHT.  NOW I UNDERSTAND.  BECAUSE I WAS

4   A BIT CONFUSED ABOUT THAT.  TECHNICALLY, THE PERMIT HAS

5   BEEN REVOKED; IS THAT FAIR?

6       A   THAT SPECIFIC PERMIT WHICH IS A CONTRACT FOR

7   THAT LOCATION HAS BEEN REVOKED.

8       Q   OKAY.

9       A   WITHOUT PREJUDICE OF THAT WORD.  AND ANOTHER

10  LOCATION ALONG THE STATE HIGHWAY SYSTEM HAS BEEN

11  IDENTIFIED FOR PLACEMENT OF A SIGN AND FOR ASSUMPTION

12  OF THE RESPONSIBILITIES UNDER THE ADOPT-A-HIGHWAY

13  PROGRAM.

14      Q   AND A NEW PERMIT WILL BE ISSUED FOR THAT SITE

15  SPECIFIC, CORRECT?

16      A   EXACTLY.

17      Q   YOU ARE NOT TAKING THE POSITION -- YOU HAVE

18  NOT TAKEN THE POSITION THAT AN ADOPT-A-HIGHWAY SIGN IN

19  ITS GENERIC SENSE IS AN ISSUE NEAR THE CHECKPOINT; IS

20  THAT FAIR?

21      A   I PERSONALLY HAVE NOT COME TO THAT

22  CONCLUSION.  ALTHOUGH, AS WE DISCUSSED PREVIOUSLY,

23  THERE HAS BEEN SOME DISCUSSION THAT THIS LOCATION, FOR

24  OTHER REASONS, NOT RELATED TO THE CASE AT HAND, MAY NOT

25  BE A SUITABLE LOCATION FOR AN ADOPT-A-HIGHWAY

```
 1      A    A LETTER WAS SENT WHICH DESCRIBED THE
 2   REASONS.
 3      Q    "FORWARD A REQUEST FOR THE PERMITS
 4   CANCELLATION TO THE DISTRICT PERMITS BRANCH.  THE
 5   REQUEST MUST INCLUDE THE REASON FOR THE REQUEST.  AND
 6   COPIES OF ANY WARNING AND/OR CANCELLATION LETTERS MUST
 7   BE ATTACHED."
 8           WAS THAT DONE?
 9      A    I DO NOT KNOW IF THAT OCCURRED.
10      Q    FOUR, "SUBMIT A WORK ORDER FOR REMOVAL OF THE
11   RECOGNITION PANEL."  THAT'S THE SIGN?
12      A    YES.
13      Q    "NOTE, A CONTRACTOR WHOSE PERMIT HAS BEEN
14   REVOKED" -- WE WON'T GO INTO THAT.
15           HAS THAT BEEN DONE?
16      A    I WOULD ASSUME IT HAS BEEN DONE.  BUT I DO
17   NOT KNOW THAT IT WAS DONE.
18      Q    HAVE YOU BEEN INFORMED THAT THE SIGN HAS BEEN
19   REMOVED?
20      A    YES.
21      Q    SO SOMETHING HAPPENED TO MOVE THE SIGN.
22           ARE YOU AWARE OF ANY OTHER SIGN BEING REMOVED
23   OR RELOCATED BECAUSE OF THE NAME THAT WAS ON THE
24   SIGN?
25      A    I AM NOT.
```

1
2
3   I DECLARE UNDER PENALTY OF PERJURY THAT THE
4   FOREGOING IS TRUE AND CORRECT.
5
6   EXECUTED THIS 15TH DAY OF April,
7   2008, AT Sacramento, CALIFORNIA.
8
9
10  _____
11  WILLIAM ALAN KEMPTON
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 98

VAN DEUSEN REPORTING (619) 287-0070

```
 1   STATE OF CALIFORNIA )
                        :
 2   COUNTY OF SAN DIEGO )

 3

 4.

 5           I, TRACI ANN TAYLOR, CERTIFIED SHORTHAND REPORTER,

 6   DO HEREBY CERTIFY:

 7

 8           THAT THE WITNESS IN THE FOREGOING DEPOSITION WAS BY

 9   ME DULY SWORN; THAT THE DEPOSITION WAS THEN TAKEN BEFORE ME AT

10   THE TIME AND PLACE HEREIN SET FORTH; THAT THE TESTIMONY AND

11   PROCEEDINGS WERE REPORTED STENOGRAPHICALLY BY ME AND LATER

12   TRANSCRIBED THROUGH COMPUTER-AIDED TRANSCRIPTION; THAT THE

13   FOREGOING IS A TRUE RECORD OF THE TESTIMONY AND PROCEEDINGS

14   TAKEN AT THAT TIME.

15

16           IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME

17   THIS  24th  DAY OF  March                  , 2008.

18

19

20

21                              _____
                                TRACI ANN TAYLOR
22                              CSR NO. 10413

23

24

25
```

VAN DEUSEN REPORTING   (619) 287-0070

EXHIBIT 1, p.15