1  Howard Kaloogian, State Bar No. 118954
   Lowell Robert Fuselier, State Bar No. 14070
2  David T. Hayek, State Bar No. 144116
   Kaloogian & Fuselier LLP
3  2382 Faraday Avenue, Suite 130
   Carlsbad, California 92008
4  Tel. 760-522-1802
   Fax. 760-431-1116
5  **Attorneys for Plaintiffs**

6

7

8                    **UNITED STATES DISTRICT COURT**
9                    **Southern District of California**

10

11  SAN DIEGO MINUTE MEN            )   Case Number:  08CV0210 WQH [RBB]
                                    )
12          Plaintiff,              )   **PLAINTIFF'S   MEMORANDUM   OF**
                                    )   **POINTS AND AUTHORITIES IN REPLY**
13      vs.                         )   **TO   OPPOSITION   TO   MOTION   FOR**
                                    )   **PRELIMINARY    INJUNCTION    &**
14  DALE BONNER in his Official Capacity as )  **EXHIBITS**
    Agency Director, Business, Transportation )
15  and Housing Agency; WILL KEMPTON in )   Hearing Date:       April 17, 2008
    his Official Capacity as CalTrans Director; )  Hearing Time:    1:30 p.m.
16  PEDRO ORSO-DELGADO in his Official )   Courtroom:          Courtroom 4
    Capacity as Caltrans District Director and )  Judge:           William Q. Hayes
17  DOES 1 through 50,              )
                                    )
18          Defendants.             )
                                    )
19  _____ )
                                    )

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3    *Appendix of Authorities*                                                                  ii

4    I. SUMMARY OF ARGUMENT                                                          1

5    II. LEGAL DISCUSSION                                                                3

6       A. DEFENDANTS' DECISION TO REVOKE PLAINTIFF'S
      SITE-SPECIFIC PERMIT WAS BASED ON PLAINTIFF'S
7          VIEWPOINT, NOT SAFETY                                          3

8       B. PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION    5

9
      1.   Plaintiff Will Prevail on its First Amendment Claim    6
10
      2.   Plaintiff Will Prevail on its Equal Protection Claim.    7
11
      3.   Plaintiff will Prevail on Due Process Claims.    8
12
   C. THE RELIEF REQUESTED PRESERVES THE
13          *STATUS QUO ANTE LITEM*                                     9

14
III. CONCLUSION                                                                      10
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3    <u>Cases</u>

4    **United States Supreme Court Cases**

5    *Ashcroft v. American Civil Liberties Union,*
     542 US. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
6

     *Board of Regents of State Colleges v. Roth,*
7     408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8    *Boddie v. Connecticut,*
     401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
9

     *Connell v. Higginbotham,*
10    403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11   *Cornelius v. N.A.A.C.P. Legal Defense and Educ. Fund, Inc.,*
     473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 6
12

13   **United States Court of Appeals Cases**

14   *Associated Gen. Contractors of Calif. vs. Coalition for Economic Equity,*
     950 F.2d 1401 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
15

16   *Gilder v. PGA Tour, Inc.,*
     936 F.2d 417, 422 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17   *Goto.com, Inc. v. The Walt Disney Company,*
     202 F.3d 1199, 1210 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
18

19   *Hale v. Department of Energy,*
     806 F.2d 910 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20   *Hopper v. City of Pasco,*
     241 F.3d 1067 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
21

22   *Lewis v. Wilson,*
     253 F.3d 1077 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

23

24   **United States District Court Cases**

     *Comite De Jornaleros De Redondo Beach v. City of Redondo Beach,*
25    475 F.Supp.2d 952 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

26   *Cuffley v. Mickes,*
     44 F.Supp.2d 1023 (E.D. Mo. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
27

28   *Jackson v. City of Markham,*
     773 F.Supp. 105 (N.D. Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1

**TABLE OF AUTHORITIES** (cont.)

2

**Page**

3    **Cases**

4    **United States District Court Cases (cont.)**

5    *Knights of Ku Klux Klan v. Arkansas State Highway and Transp. Dept.,*
6        807 F. Supp. 1427 (W.D. Ark. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. SUMMARY OF ARGUMENT

Defendants' position can be summarized as follows: Caltrans, opposing the message spoken by the name "San Diego Minute Men" and fearing controversy and reprisals from certain state legislators and a few constituents who opposed that message,[1] acted to preclude Plaintiff from participating in the program at the location for which Defendants previously issued Plaintiff a site-specific permit. Defendants, cognizant of the constitutional obstacles, argue they can accomplish their viewpoint-based discrimination by asserting a speculative "safety" issue and, based on that subjective, unsupported conclusion, revoke Plaintiff's permit and remove the subject segment from the program. Of course, the so-called "safety" issue is solely tied to the message of Plaintiff. Defendants agree that the location itself is safe with no history of any safety issue ever. *Orso-Delgado depo.*, [87:12-25 and depo. Ex. 16], Ex. 1, pp. 17 and 19.

The discretion Defendants attempt to wield is reminiscent of landlords who, when approached by a potential renter who happened to be a person of color, would "suddenly" decide they weren't going to rent their property to "anyone," only to immediately "change their mind again" as soon as the person of color had driven away (except here, Defendants had *already* entered into a legal and binding permit with Plaintiff, then revoked it. *See. Schwilk Decl.* [Doc#2, Att.1], ¶7 and Ex. 4. It is this kind of discrimination that Defendants ask this Court to condone.

As is plain from a reading of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction [Doc #26], Defendants' argument against granting the relief requested is premised on two propositions: First, that Caltrans has the unfettered discretion to remove the segment of highway for which it granted Plaintiff a site-specific permit for "reasons of safety and operational concerns." Second, Defendants assert that the movement of Plaintiff's adopted highway from the location which it permitted to a more remote location was not violative of Plaintiff's rights.

As testified to by Defendant Will Kempton, the Caltrans Director (who made the decision to

---

[1] *Deposition of Pedro Orso-Delgado* taken April 8, 2008 ("*Orso-Delgado depo.*"), [86:14-20], Ex. 1, p. 16]. Referenced portions of Mr. Orso-Delgado's deposition are attached hereto as Exhibit 1. The Complete transcript has been lodged with the Court [Doc#27]. References include both transcript pagination in format *[page:line]* and consecutive exhibit page numbering.

1   revoke Plaintiff's site specific permit[2] and Defendant Pedro-Orso Delgado, the District 11 Director

2   for Caltrans, there is not now, nor has there ever been, *any safety issue* which attaches to the location

3   designated ND 5: SD66.3-SD68.3. *Orso-Delgado depo.*, [87:12-25 and depo. Ex. 16], Ex. 1, pp. 17

4   and 19. Indeed, the testimony of Orso-Delgado demonstrates that Mr. Orso-Delgado was concerned

5   about the *message* of Plaintiff's name on the recognition sign. *Orso-Delgado depo.*, [87:23-25], Ex.

6   1, p. 17. Mr. Orso-Delgado fully recognized that to revoke or otherwise change Plaintiff's site-

7   specific permit for that reason was a violation of Plaintiff's rights ( *Orso-Delgado depo.*, [74:22 -

8   76:12], Ex. 1, pp. 11-13) but, determined to do so anyway, then concocted an unsupported "safety

9   concern" out of thin air in an effort to hide Defendants' viewpoint discrimination. But even in that

10  effort Defendants failed, because the only "safety" issue Defendants could manufacture was

11  conjecture that illegal immigrant traffic passing by Plaintiff's recognition sign on the freeway would

12  be compelled to respond to Plaintiff's message in an "unsafe" way. Of course, granting such a

13  "heckler's veto" in violation of Plaintiff's First Amendment Rights is improper. The falsity of

14  Defendants purported justification (that locations adjacent to border checkpoints are unsafe) is

15  further demonstrated by the fact that, *except for the Plaintiff*, the permittees for locations adjacent

16  to border checkpoints would be allowed to keep their permits until the natural expiration of that

17  permit. *Orso-Delgado depo.*, [70:1-14], Ex. 1, p. 10. If such locations were *actually* unsafe, would

18  Defendants allow them to remain in the program for years? Why the unequal treatment of Plaintiff?

19       Also, the Guidebook for the AAH Program clearly provides the guidelines for determining

20  whether a location is "safe" and appropriate for adoption. *See Program Guidelines and*

21  *Coordinator's Handbook* [Doc #19, Att. 2], at Ch. 7. Defendants admit that the subject segment has

22  been determined "safe." *Orso-Delgado depo.*, [87:12-25 and depo. Ex. 16], Ex. 1, pp. 17 and 19.

23       The second premise underlying Defendants' Opposition, that Caltrans "only moved" Plaintiff's

24  permit to a remote location, again is repugnant to the Constitution. The law is clear that one cannot

25  discriminate against a speaker because of that's speaker's message and, as a result, relegate that

26

27       [2] *Deposition of William Alan Kempton* taken on March 20, 2008 ("*Kempton depo.*") [47:20-

28  48:8], Ex. 2, pp. 27-28. Referenced portions of Mr. Kempton's deposition are attached hereto as
    Exhibit 2. The complete transcript has been lodged with the Court [Doc. # 27].

1   speaker's message "behind the barn." As Director Kempton testified, Plaintiff's is the only permit
2   ever moved based on the Plaintiff's message as represented by its recognition sign. *Kempton depo.*
3   [61:22-25], Ex. 2, p. 29. Betraying the myth that the border checkpoint renders the segment unsafe,
4   Mr. Orso-Delgado testified that if there were complaints about the new location of Plaintiff's permit
5   (nowhere near a border checkpoint), he would move their location to an even more remote location.
6   *Orso-Delgado depo.*, [84:19-85:25], Ex. 1, pp. 14-15. The "hecklers" have already promised such
7   a response. *Orso-Delgado depo.*, portion of depo. Ex. 7], Ex. 1, p. 18. But, references to moving
8   Plaintiff's permitted location is conjecture: ***Plaintiff's recognition sign has never been re-erected***
9   ***in any location.***    *Orso-Delgado depo.*, [8:11-22], Ex. 1, p. 2.    Thus, though unavailing for
10  Defendants in any event, the argument that Plaintiff has not suffered damage because its location has
11  merely been moved is specious because Plaintiff's recognition sign has never been re-erected
12  ***anywhere***. As set forth below,[3] Plaintiff has asserted all elements necessary to obtain the relief
13  requested. The motion for preliminary injunction should be granted.

14
15                                   **II. LEGAL DISCUSSION**
16
17  **A.  DEFENDANTS' DECISION TO REVOKE PLAINTIFF'S SITE-SPECIFIC PERMIT**
18       **WAS BASED ON PLAINTIFF'S VIEWPOINT, NOT SAFETY**
19       Defendant Orso-Delgado learned about the adoption of location ND 5: SD66.3-SD68.3 by the
20  San Diego Minutemen after Plaintiff's site-specific permit had already been issued. Once he learned
21  of the permit, he decided that he wanted the sign taken down. He learned, however, that there were
22  no safety issues with the location; in fact, the location had been used for years with no safety issues.
23  *Orso-Delgado depo.*, [87:12-25 and depo. Ex. 16], Ex. 1, pp. 17 and 19.
24       But Defendants did not want Plaintiff's sign to remain. So they took it upon themselves to
25
26  ─────────────────
        [3] These issues are also addressed in Plaintiff's moving papers [Doc #13, Attach. 1], as well
27  as in its Opposition to Defendants' Motion to Dismiss [Doc #25 & Attach 1]. Rather than repeat the
        discussion in these documents and in light of the fact that the hearing on each motion is the same
28  day, Plaintiff incorporates each herein by this reference as though fully set forth at length hereat.

1   embark on a search for some reason to revoke the Plaintiff's permit. Defendants had the California

2   Highway Patrol conduct a secret investigation of Plaintiff (*Kempton depo*. [89:2-92:3], Ex. 2, pp.

3   33-36), but found nothing inappropriate in Plaintiff's philosophy. (*Kempton depo*. [23:17-24:5], Ex.

4   2, pp. 23-24. Next Defendants sought to find a "safety" issue they could hang their hats on. But they

5   found that the subject highway segment had "no safety issue."*Orso-Delgado depo*., [87:12-25 and

6   depo. Ex. 16], Ex. 1, pp. 17 and 19.

7       Lack of *any empirical date* notwithstanding, Defendants made a conscious decision to "backfill"

8   their viewpoint-based decision to revoke Plaintiff's site-specific permit by asserting that a "safety"

9   issue arose and, based thereon, revoked Plaintiff's permit and purportedly removed the entire

10  segment from the program in order to preclude Plaintiff from maintaining that section of the

11  highway. However, the purported "safety" claim is a fabrication. In fact, there is no evidence to

12  suggest *any* safety issue is involved with the subject location. *Orso-Delgado depo*., [87:12-25 and

13  depo. Ex. 16], Ex. 1, pp. 17 and 19. Instead, A closer look at the purported "safety issue" reveals

14  that it is *really* based on purely subjective speculation about what future illegal immigrant motorists

15  *might* do when seeing the Plaintiff's courtesy sign.   *Orso-Delgado depo*., [24:21-26:5], Ex. 1, pp.

16  7-9. No study, no research and no data. *Orso-Delgado depo*., [21:14-19], Ex. 1, p. 5. Just the

17  subjective musings of Defendants. *Kempton depo*. [13:25-14:4], Ex. 2, pp. 22-22.

18      Apparently realizing that it would be harder to justify removing only Plaintiff's permitted

19  segment from the program based on its proximity to the border checkpoint while there were several

20  other such segments in the AAH system, Defendants concocted a scheme to provide "cover" for this

21  decision by suggesting that *all* segments of the Adopt-A-Highway program adjacent to border

22  checkpoints from the system all together. (Note that, according to Caltrans Director Kempton, no

23  such removal has even occurred *Kempton depo*. [43:1-44:11], Ex. 2, pp. 25-26.) But even in that

24  effort, Defendants' actions were constitutionally impermissible. As Orso-Delgado testified, while

25  he "planned" on removing all segments of the highways adjacent to border checkpoints, the *only*

26  permit which was revoked was that of Plaintiff. As to other permittees, Mr. Orso-Delgado testified:

27  Q:              IS THAT SIGN OKAY IN THAT LOCATION, AS FAR AS
                    YOU'RE CONCERNED?

28  ORSO-DELGADO: BASED ON THE DIRECTION THAT I HAVE GIVEN MR.

1
2

        VALLE, AS SOON AS THAT ADOPTEE EITHER LAPSES OR TERMINATES IN THIS LOCATION, WE WILL NOT HAVE THIS LOCATION ONE OF THE ADOPTABLE SEGMENTS AGAIN?

3 Q       THAT'S ON HIGHWAY 15?

ORSO-DELGADO: YES.  THE SAME WILL HAPPEN ON INTERSTATE 8, AND
4        STATE ROUTE 94, AND AT THE CHECKPOINT ON I-5 WHERE
        THE ACTUAL BORDER IS, AND ON STATE ROUTE 905.

5 *Orso-Delgado depo.*, [70:1-14], Ex. 1, p. 10.

6   A clearer violation of equal protection is difficult to formulate.  While all other permittees in

7 similar locations are allowed to keep their locations until the permit expires, only the San Diego

8 Minutemen's permit was instantaneously revoked.  Why?  Because of Plaintiff's message.  *Orso-*

9 *Delgado depo.*, [21:20 - 22:10], Ex. 1, pp. 5-6. Moreover, if there ***really*** were a safety issue

10 concerning the locations adjacent to border checkpoints, why would Caltrans wait for permits to

11 expire to remove them from the program?  Of course, they would not.  It's only the San Diego

12 Minute Men's segment that was *revoked*.  This is further evidence that the "safety concern" is

13 nothing but a ruse.  Such discrimination by Defendants cannot stand.

14

15 **B. PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION.**

16   To establish entitlement to a preliminary injunction, a party must show irreparable injury and

17 a likelihood of success on the merits. *Ashcroft v. American Civil Liberties Union*, 542 US. 656, 665

18 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004).

19   In this case, Plaintiff has demonstrated both elements. As set forth more fully below, Plaintiff's

20 claims arise from the type of conduct by defendants which has been scrutinized many times by the

21 courts, and found to be violative of constitutional protections. Where a party's constitutional rights

22 are violated, irreparable injury is demonstrated. *Associated Gen. Contractors of Calif. vs. Coalition*

23 *for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).

24   Moreover, since the issues raised by Plaintiff herein are similar to those where other Plaintiff's

25 have prevailed, Plaintiff has demonstrated a "reasonable probability of success." *Gilder v. PGA*

26 *Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991). Indeed, this case so analogous to *Lewis v. Wilson*,

27 253 F.3d 1077 (8th Cir. 2001) as to render the entire analysis in that case applicable here.

28   Here, the facts demonstrate that Defendants made a decision to revoke Plaintiff' site-specific

1   permit based on the Plaintiff's viewpoint - a viewpoint associated with Plaintiff's name. Once they

2   learned of the permit's issuance, Defendants set on a course to come up with a reason to revoke it

3   – clearly because they found Plaintiff's message repugnant and sought to avoid the controversy

4   surrounding that message. *Orso-Delgado depo.*, [13:14-14:23], Ex. 1, pp. 3-4. While they purported

5   to base the decision on "safety," Defendants' testimony makes clear that any claim of safety was

6   based on nothing more than speculation and conjecture – utterly fabricated. *Orso-Delgado depo.*,

7   [21:14-19], Ex. 1, p. 5. In fact, all objective data given to defendants clearly demonstrated that the

8   location was safe and had been adopted as part of the program for years. *Orso-Delgado depo.*,

9   [87:12-25 and depo. Ex. 16], Ex. 1, pp. 17 and 19. It is clear that, in Defendants minds, it was

10  Plaintiff's viewpoint that was "dangerous," thereby creating a "safety" issue.

11

12      **1. Plaintiff Will Prevail on its First Amendment Claim.**

13          In the Ninth Circuit and other jurisdictions, Courts have recognized that roads, highways and

14  sidewalks (thoroughfares) have been classified as public fora so long they are often spoken of as

15  "traditional public fora" and alleged speech abridgement at such fora are reviewed using the highest

16  level of scrutiny . *See, e.g. Comite De Jornaleros De Redondo Beach v. City of Redondo Beach*, 475

17  F.Supp.2d 952, (C.D. Cal. 2006); *Hale v. Department of Energy*, 806 F.2d 910, 917 (9th Cir. 1986)

18  [one factor bearing on the reasonableness of restriction at one location is the existence of adjacent

19  Highway as public forum for expressive activity]. Even if privately owned, the shoulder of a public

20  highway is a public forum. *Jackson v. City of Markham*, 773 F.Supp. 105, 107 (N.D. Ill. 1991).

21          Defendants testified that the speech value of courtesy sign and the Adopt-A-Highway program

22  was undeniable. *Kempton depo.* [62:23-64:6] Ex. 2, pp. 30-32. Thus, even if a highway were not

23  already a traditional public forum, it became designated  as such when Caltrans implemented its

24  Adopt-A-Highway Program including recognition signs bearing the name of the program

25  participants.

26          But even assuming *arguendo* that a highway is a non-public forum, any attempt to regulate

27  speech *must be viewpoint neutral. Cornelius v. N.A.A.C.P. Legal Defense and Educ. Fund, Inc.,* 473

28  U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In this case, the decisions made by

1  Defendants were based *solely* on the viewpoint of Plaintiff and their subjective and unsupported

2  concern that Plaintiff's message (as identified with its name) would engender controversy.

3  Defendants acknowledge that there is absolutely *no* safety issue relating to the location itself – it was

4  determined safe for the program and was adopted by others for years prior to Plaintiff's permit.

5  Moreover, in their effort to "get around" the first amendment "impediments" which Defendants

6  recognized precluded their viewpoint discrimination, they specifically inquired into the safety issues

7  and found none. In short, the purported "safety" issue, which arises only from conjecture about what

8  others "might" do if the Plaintiff's permit were restored, is an utter fabrication of convenience.

9   [T]he mere possibility of a violent reaction to . . . speech is simply not a
    constitutional basis on which to restrict her right to speak. [Citations omitted.]

10  "The argument amounts to little more than the self-defeating proposition that to
    avoid physical censorship of one who has not sought to provoke such a response by

11  a hypothetical coterie of the violent and lawless, the States may more appropriately
    effectuate that censorship themselves," [*Cohen v. California*, 403 U.S. 15, 23

12  (1971)]. Even if we assume that the DOR made no judgment about the viewpoint
    of [Plaintiff's] speech, therefore, we reject its attempt to censor Ms. Lewis's speech

13  because of the potential responses of its recipients. The first amendment knows no
    heckler's veto.

14  *Lewis, supra*, 253 F.3d at 1081-1082. [Emphasis supplied.]

15      The fallacy of Defendants' position is further demonstrated by the fact that, prior to Defendants'

16  revocation of Plaintiff's permit, Plaintiff's members had *already* performed a cleanup of their

17  permitted section of highway without the occurrence of any of the "parade of horribles" dreamed up

18  by Defendants to excuse their conduct. *See Decl. of Jeff Schwilk* [Doc #2, Att. 1] at ¶5 and Ex. 2.

19

20      **2. Plaintiff Will Prevail on its Equal Protection Claim.**

21      In an effort to diminish Plaintiff's right to speech, Caltrans offered to move Plaintiff's site-

22  specific permit to a location far more remote than the site for which it was originally issued. Of

23  course, such an effort to "hide" Plaintiff's speech is constitutionally impermissible. As noted in

24  *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001):

25      The city steadfastly maintains that its exclusion of plaintiffs' works was not
        "censorship" since Hopper and Rupp "have been free to show their art throughout

26      the City, *other than [at] city hall*." The art, in Pasco's view, was merely ejected
        from the parlor, not thrown off the farm. But relegating the art to the barnyard does

27      not pass First Amendment scrutiny.

    *Id.*, at p.1081-1082. [*Underlining supplied. Other emphasis in original.*] [Footnote omitted.]

28

---

1   No other permittee has ever had its permit revoked and moved to another location because of

2   its viewpoint.   Clearly, this demonstrates differential treatment of Plaintiff based upon its message.

3   Mr. Orso-Delgado testified that it was his intention to remove Plaintiff from its location and,

4   in an effort to create a plausible excuse for doing so which might survive constitutional scrutiny,

5   suggest that all segments of highway adjacent to border checkpoints would be removed from the

6   program all-together.  However, Caltrans Director Kempton testified that the location permitted to

7   Plaintiff *had not* been removed from the program.  *Kempton depo.* [43:1-44:11], Ex. 2, pp. 25-26.

8   Moreover, Mr. Orso-Delgado admitted that, while it was his intention to remove all such segments

9   from the program, all permittees ***other than Plaintiff*** would be allowed to keep their locations

10  adjacent to the border checkpoint until the expiration of their five-year permit.   Only the San Diego

11  Minute Men's permit was revoked immediately.   *Orso-Delgado depo.*, [70:1-14], Ex. 1, p. 10.

12  Again, this is the paradigm of an equal protection violation.

13

14  **3.  Plaintiff will Prevail on Due Process Claims.**

15  The San Diego Minute Men have alleged claims arising from both procedural and due process

16  violations by Defendants.  In both cases, the violations are manifest and it is clear that Plaintiff will

17  prevail on its claims.

18  The requirements for establishing a violation of due process are well established.   Before a

19  person is deprived of a protected interest, he must be afforded opportunity for some kind of a

20  hearing, 'except for extraordinary situations where some valid governmental interest is at stake that

21  justifies postponing the hearing until after the event.'*Boddie v. Connecticut*, 401 U.S. 371, 379 91

22  S.Ct. 780, 28 L.Ed.2d 113 (1971).

23       'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat
         (constitutional) concepts . . . purposely left to gather meaning from experience. . .
24  *National Mutual Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 646 (Frankfurter, J., dissenting).

25  Property interests protected by procedural due process extend well beyond actual ownership of

26  real estate, chattels, or money.  *See, e.g., Connell v. Higginbotham*, 403 U.S. 207, 208, 91 S.Ct.

27  1772, 29 L.Ed.2d 418 (1971).   The evidence already adduced shows that Defendants' conduct

28  impacted on Plaintiff's right to free speech.  As noted above, the participation in the AAH program

1   *is speech. Knights of Ku Klux Klan v. Ark. State Hwy and Transp. Dept,* 807 F. Supp. 1427 (W.D.

2   Ark. 1992); *Cuffley v. Mickes*, 44 F.Supp.2d 1023 (E.D. Mo. 1999).   As such, Plaintiff has

3   demonstrated a fundamental right for which the procedural due process protections afforded by the

4   Fourteenth Amendment apply.

5           Even absent the first amendment issue, Plaintiff still has asserted a right subject to due process

6   requirements. As stated in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701,

7   33 L.Ed.2d 548 (1972):

8               To have a property interest in a benefit, a person clearly must have more than an
                abstract need or desire for it. He must have more than a unilateral expectation of it.
9               He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the
                ancient institution of property to protect those claims upon which people rely in
10              their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of
                the constitutional right to a hearing to provide an opportunity for a person to
11              vindicate those claims.
     *Roth*, *supra*, 408 U.S. at 577.
12
            In this case, Plaintiff has alleged such a property interest.   As noted by Caltrans' Director
13
     Kempton, the site-specific permit is a contract (*Kempton depo.* [48:3-7], Ex. 2, p. 28), which
14
     Defendants revoked. Plaintiff was granted and issued a site-specific encroachment permit for the I-5
15
     NB location.  Pursuant to the Adopt-A-Highway program guidelines, such a permit has a duration
16
     of five years.  Thus, Plaintiff had a "legitimate claim of entitlement" to the permit.
17

18   **C.    THE RELIEF REQUESTED PRESERVES THE *STATUS QUO ANTE LITEM.***
19
            Defendants attempt to brand the relief sought as a "mandatory" injunction and thereby invoke
20
     more stringent scrutiny of Plaintiff's request. While it is true that, at this point in time, the injunctive
21
     relief will require Defendants to put Plaintiff's recognition sign back up, such relief is really
22
     returning the parties to the *status quo ante litem* and stops the continued irreparable injury to
23
     Plaintiff.  As the Ninth Circuit noted:
24
                The status quo ante litem refers not simply to any situation before the filing of a
25              lawsuit, but instead to "the last uncontested status which preceded the pending
                controversy,"[citations].  In this case, the status quo ante litem existed before
26              Disney began using its allegedly infringing logo. The interpretation of this concept
                that Disney advocates would lead to absurd situations, in which plaintiffs could
27              never bring suit once infringing conduct had begun.  Disney severely
                mischaracterizes this concept, and we conclude that its argument is without merit.
28   (*Goto.com, Inc. v. The Walt Disney Company, 202 F.*3d 1199, 1210 (9th Cir. 2000).

1    In this case, the last uncontested status was where the site specific permit issued by Caltrans to

2    Defendant was in effect and Plaintiff's recognition sign was in place. Defendants cannot prevent a

3    return to that position by its infringing conduct. But even under the analysis for mandatory

4    injunctions, Plaintiff has demonstrated its entitlement to relief.

5    Defendants also argue that the Court cannot grant the Preliminary Injunction because it affords

6    Plaintiff substantially the relief Plaintiff would obtain after trial on the merits" and by arguing it is

7    "mandatory" in nature. As to the first proposition, the injunctive relief requested is sought to *stop*

8    *the continued violation of Plaintiff's Constitutional rights.* However, this is not substantially all the

9    relief sought by Plaintiff. Plaintiff has asserted a claim for monetary damages pursuant to 42 U.S.C.

10    §1983 to compensate Plaintiff for Defendants' violations of that statute. *That* is the substantive relief

11    sought. The injunctive relief is sought to *avoid further irreparable injury*.

12    **III.  CONCLUSION**

13    Unhappy with Plaintiff's viewpoint and the political pressure placed on them by some

14    legislators and a handful of constituents who opposed that viewpoint, Defendants determined that

15    Plaintiff's message must be silenced or, at a minimum, isolated and muffled. Though attempting a

16    ruse based on "safety concerns," it is clear that it is Plaintiff's viewpoint that Defendants find

17    "dangerous." Such actions are clearly repugnant to the Constitution, and Plaintiff has been

18    irreparably harmed by such conduct. Plaintiff has demonstrated every element necessary for

19    entitlement to the relief requested.

20    For all of the foregoing reasons, as well as those stated in Plaintiff's other papers herein,

21    Plaintiff is entitled to a Preliminary Injunction which returns the parties to the *status quo ante litem*

22    until this Court fully adjudicates all of the issues herein.

23    DATED:    May 1, 2008

24                                                                /s/ L. Robert Fuselier
                                                                Lowell Robert Fuselier, Esq.
25                                                             David T. Hayek, Esq.
                                                                Kaloogian & Fuselier, LLP
26                                                             Attorneys for Plaintiff

27

28

# EXHIBIT 1

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

SOUTHER DISTRIC OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO MINUTE MEN, | ) |
| | ) |
|        PLAINTIFF, | ) |
| | ) |
|    VS. | ) CASE NO.  08CV0210 WQH |
| | )      (RBB) |
| DALE BONNER IN HIS OFFICIAL | ) |
| CAPACITY AS AGENCY DIRECTOR, | ) |
| BUSINESS, TRANSPORTATION AND | ) |
| HOUSING AGENCY; WILL KEMPTON | ) |
| IN HIS OFFICIAL CAPACITY AS | ) |
| CALTRANS DIRECTOR; PEDRO | ) |
| ORSO-DELGADO IN HIS OFFICIAL | ) |
| CAPACITY AS CALTRANS DISTRICT | ) |
| DIRECTOR AND DOES 1 THROUGH | ) |
| 50, | ) |
| | ) |
|        DEFENDANTS. | ) |

DEPOSITION OF PEDRO ORSO-DELGADO

SAN DIEGO, CALIFORNIA

APRIL 8, 2008

REPORTED BY:  TRACI ANN TAYLOR, CSR NO. 10413

VAN DEUSEN REPORTING

(619) 287-0070 - FAX 287-3010

EXHIBIT 1

1

1    HAVE SOME INFORMATION, THAT WOULD BE A PURE GUESS.  YOU

2    SHOULD NOT GUESS.

3              DO YOU UNDERSTAND THE DIFFERENCE?

4        A    YES.

5        Q    I THINK THAT'S GOING TO COVER MOST OF THE

6    GROUND WORK FOR US.

7              IS THERE ANY REASON WE SHOULDN'T PROCEED WITH

8    YOUR DEPOSITION TODAY?  DO YOU FEEL BAD?  YOU ON

9    MEDICATION?  ANYTHING LIKE THAT?

10       A    NO, NOT AT ALL.

11       Q    THE CONTROVERSY THAT'S BEFORE US HAS TO DO

12   WITH THE REMOVAL OF THE MINUTEMEN ADOPT-A-HIGHWAY SIGN.

13             YOU'RE FAMILIAR WITH THAT, RIGHT?

14       A    CORRECT.

15       Q    DID YOU MAKE ANY DECISIONS CONCERNING THE

16   REMOVAL OF THE SIGN?

17       A    THE RELOCATION.  NOT REMOVAL.

18       Q    IS THE SIGN UP NOW?

19       A    NO.

20       Q    IS IT DOWN?

21       A    YES.

22       Q    HAS IT BEEN RELOCATED?

23       A    NO.

24       Q    DID YOU MAKE ANY DECISIONS WITH REGARD TO THE

25   REMOVAL OF THE SIGN?

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 1

2

1    ISSUE, FROM MY PERSPECTIVE, THAT WE HAD THE PROSPECTS

2    OF A CONFRONTATION THAT MIGHT OCCUR AT THAT LOCATION

3    BETWEEN THE FOLKS THAT WOULD ACTUALLY BE OUT THERE

4    CLEANING UP THE HIGHWAY UNDER THE PERMIT AND OTHER

5    INDIVIDUALS WHO MIGHT DISAGREE WITH THEM, THAT THERE

6    COULD BE POTENTIALLY A PROBLEM WITH PEOPLE TRAVELING BY

7    THE SITE, THROWING OBJECTS AT THE FOLKS ACTUALLY DOING

8    THE LITTER PICKUP, OR SOMEONE JUST STOPPING ALONG THE

9    ROADWAY, WHICH IS A DANGEROUS SITUATION IN AND OF

10   ITSELF, TO CUT DOWN A SIGN THAT HAD THE MINUTEMEN

11   ADOPTION LISTED ON IT.

12       Q    AND WHY DID YOU THINK THAT ANY OF THOSE

13   EVENTS MIGHT OCCUR?

14       A    WELL, I THINK THAT THE ISSUE OF IMMIGRATION

15   IS CERTAINLY, BY MOST REASONED CONSIDERATIONS, AN ISSUE

16   OF SOME CONTROVERSY IN THIS COUNTRY.  AND YOU -- WHEN

17   YOU HAVE ONE COMMUNITY THAT BECOMES PITTED AGAINST

18   ANOTHER COMMUNITY, WHATEVER THE REASON, CERTAINLY

19   CONFRONTATIONS FROM TIME TO TIME DO OCCUR.

20            AND THIS ISSUE OF THE MINUTEMEN'S CONCERN

21   ABOUT IMMIGRATION AND THE FACT THAT THERE WOULD BE

22   SIGNIFICANT TRAFFIC ALONG THAT CORRIDOR, INCLUDING

23   IMMIGRANT TRAFFIC, THAT THERE WAS A RISK OF THAT KIND

24   OF CONFRONTATION OCCURRING.

25       Q    WAS THIS A SUBJECTIVE CONCLUSION THAT YOU

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 1

3

1    CAME TO ON YOUR OWN?

2         A    I WOULD SAY, YES, IT WAS A SUBJECTIVE

3    CONCLUSION.  AND I DID COME TO THAT CONCLUSION ON MY

4    OWN.

5         Q    OKAY.  WAS IT YOUR DECISION TO MOVE THE

6    SIGN?

7         A    YES.

8         Q    WHAT CRITERIA DID YOU USE TO SELECT THE NEW

9    LOCATION?

10              MR. MUELLER:  ASSUMES FACTS NOT IN

11    EVIDENCE.

12              THE WITNESS:  PARDON ME?

13              MR. MUELLER:  ASSUMES FACTS NOT IN EVIDENCE.

14    LACK OF FOUNDATION.

15    BY MR. FUSELIER:

16         Q    THIS IS ONE OF THOSE MOMENTS WHERE YOU ANSWER

17    ANYWAY.

18         A    SO I HAVE TO GO AHEAD AND ANSWER ANYWAY?

19              I DID NOT PERSONALLY USE ANY CRITERIA.  IT

20    JUST SEEMED THAT WE NEEDED TO RELOCATE THAT SIGN TO A

21    LOCATION THAT WAS LESS SIGNIFICANT WITH RESPECT TO AN

22    IMMIGRATION FACILITY IN CLOSE PROXIMITY TO AN AREA OF

23    HIGHWAY ADOPTED BY THE MINUTEMEN GROUP.

24         Q    GOING BACK TO YOUR CONCERNS -- YOUR SAFETY

25    CONCERNS.  WAS IT YOUR THOUGHT THAT THE NAME, SAN DIEGO

Page 14

4

1      Q     OKAY.

2      A     -- I WOULD SAY.

3      Q     NOW, WHO ELSE WAS PART OF THAT DECISION

4  BESIDES YOU?

5      A     NO ONE, I BELIEVE.  I CONSULTED WITH MR. BILL

6  VALLE, WHO'S MY CHIEF DEPUTY OF MAINTENANCE AND

7  OPERATIONS.  AND I ASKED HIM TO LOOK AT, YOU KNOW,

8  OTHER SEGMENTS WITH SIMILAR SITUATIONS SO THAT WE CAN

9  START PULLING THOSE ALSO.  SO IT IS NOT JUST THIS

10 SEGMENT THAT WE'RE FOCUSING ON.

11     Q     SO IT IS JUST YOU THAT MADE THE DECISION; IS

12 THAT FAIR?

13     A     YES.

14     Q     DID YOU CONDUCT ANY STUDIES OTHER THAN TO

15 JUST TALK WITH PEOPLE?  DID YOU CONDUCT ANY STUDIES

16 ABOUT THAT SEGMENT OF THE HIGHWAY THAT LED YOU TO THE

17 CONCLUSION THAT IT WAS UNSAFE TO HAVE THE MINUTEMEN

18 SIGN THERE?

19     A     NO.

20     Q     WHAT ABOUT THE OTHER SIDE OF THE INTERSTATE

21 ACROSS THE -- LET'S SEE.  THAT WOULD BE THE SOUTHBOUND

22 SIDE.

23     A     YES, SIR.

24     Q     ARE YOU GOING TO REMOVE THAT FROM THE SYSTEM

25 AS WELL?

1        A     WHEN THE SEGMENT LAPSES, YES, WE WILL.

2        Q     WELL, IF IT IS UNSAFE, WHY ARE YOU WAITING

3   FOR THE SEGMENT TO LAPSE?

4        A     IT HASN'T CREATED THE CONTROVERSY THAT THIS

5   ONE DID.

6        Q     OKAY.  SO WE'RE BACK TO THE SIGN -- THE

7   MESSAGE OF THE SIGN CREATING A CONTROVERSY?

8        A     UH-HUH.

9        Q     "YES"?

10        A     YES.

11        Q     NOW, YOU MADE A STATEMENT EARLIER IN YOUR

12   TESTIMONY THAT YOU HAVE NEVER HAD AN ISSUE WHERE A SIGN

13   CREATED A CONTROVERSY.

14        A     THAT IS CORRECT.

15        Q     WHAT ABOUT THE PLANNED PARENTHOOD SIGN, HAS

16   THAT EVER CAUSED A CONTROVERSY?

17        A     I HAVE NOT BEEN AWARE OF ANY IN THIS

18   DISTRICT.

19        Q     WELL, THAT MIGHT BE BECAUSE THEY ARE OUT OF

20   THE DISTRICT.

21            MR. BENOWITZ:  I THINK THEY ARE IN ORANGE

22   COUNTY, COUNSEL.

23            MR. FUSELIER:  SORRY.

24            MR. BENOWITZ:  I THOUGHT IT WAS ORANGE

25   COUNTY.

1    LOCATION FOR THE SAN DIEGO MINUTEMEN SIGN?

2          A    UH-HUH.

3          Q    IS THAT A "YES"?

4          A    YES.  I'M SORRY.

5          Q    AND WHERE WOULD THAT BE?

6          A    ON STATE ROUTE 52.

7          Q    WHY IS THAT A BETTER LOCATION?

8          A    BECAUSE WE DON'T HAVE THE AMOUNT OF TRAFFIC.

9    WE DON'T HAVE A CHP FACILITY NOR A BORDER PATROL

10   FACILITY.

11         Q    WHAT'S THE DIFFERENCE IN THE TRAFFIC BETWEEN

12   THESE TWO LOCATIONS, THE ONE AT THE ORIGINAL SITE AND

13   THE ONE AT THE POST-SITE?

14         A    ABOUT THREE TO ONE.

15         Q    AND IS THE DEMOGRAPHIC MAKEUP OF THE TRAFFIC

16   OF ANY CONCERN TO YOU?

17              MR. BENOWITZ:  OBJECTION.  CALLS FOR

18   SPECULATION.  VAGUE AND AMBIGUOUS.

19         A    NO.

20   BY MR. FUSELIER:

21         Q    I'LL SUGGEST TO YOU THAT MR. KEMPTON WAS

22   PARTICULARLY CONCERNED ABOUT THE IMMIGRANT TRAFFIC AND

23   THAT BEING A HIGHER CONCENTRATION AT THE BORDER

24   CHECKPOINT.

25              DO YOU HAVE ANY OF THOSE CONCERNS?

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 1

7

1          A    AT THE ORIGINAL LOCATION, YES.

2          Q    WHY IS THAT?

3          A    BECAUSE YOU HAVE A LOT OF IMMIGRANTS, EITHER

4     LEGAL OR ILLEGAL, GOING BY.  AND THAT'S PART OF WHAT

5     THIS SAFETY CONCERN IS STEMMING FROM.

6          Q    SO YOU THINK THE IMMIGRATION TRAFFIC WOULD BE

7     THE TRAFFIC THAT MIGHT REACT TO THE MESSAGE OF THE

8     MINUTEMEN ON THAT SIGN?

9          A    NOT NECESSARILY THAT TRAFFIC ONLY.  I MEAN,

10    THERE IS ALSO GROUPS AND ASSOCIATIONS THAT ARE NOT

11    IMMIGRANTS, QUOTE, UNQUOTE, THAT COULD CREATE A

12    PROBLEM.  I MEAN, WE RECEIVED A LOT OF COMMUNICATION

13    FROM VARIOUS GROUPS SAYING, "WHAT ARE YOU GUYS DOING,"

14    YOU KNOW, WHEN THE SIGN WENT UP, AND WHEN THE SAN DIEGO

15    MINUTEMEN ACTUALLY WENT AND HAD A PRESS CONFERENCE

16    ABOUT IT.

17         Q    SO THEN THE FACT THAT THERE IS A HIGH

18    CONCENTRATION OF IMMIGRATION TRAFFIC THERE DOESN'T

19    FACTOR INTO YOUR DECISION?

20              MR. BENOWITZ:  OBJECTION.  MISSTATES HIS

21    TESTIMONY.

22         A    NO.  I SAID THAT IT DOES.

23    BY MR. FUSELIER:

24         Q    OH.  IT DOES?

25         A    ON I-5 IT DOES.  I MEAN, THERE IS A LARGE

1   AMOUNT. AND THAT CREATES PART OF THE SAFETY CONCERN IN

2   THAT LOCATION.

3        Q     BECAUSE OF THEIR POSSIBLE ADVERSE REACTION TO

4   THE MESSAGE OF THE SIGN?

5        A     ABSOLUTELY.

6        Q     OKAY.  I GOT IT.  SOMETIMES I HAVE TO GO A

7   LITTLE PIECE AT A TIME.  PLEASE BE PATIENT WITH ME.

8   I'LL TRY NOT TO PLOW THE SAME GROUND.

9        A     I UNDERSTAND.

10       Q     DID YOU CONSULT WITH THE CALIFORNIA HIGHWAY

11  PATROL ABOUT THIS MATTER?

12       A     YES, WE DISCUSSED IT WITH --

13       Q     WE'RE BACK TO "WE" AGAIN.

14       A     MYSELF.  I DISCUSSED IT WITH THE LOCAL

15  HIGHWAY PATROL CHIEF AND THE ASSISTANT CHIEF.

16       Q     WHO ARE THEY?

17       A     CHIEF CARTER AND CHIEF LYKINS.

18       Q     AND WHAT DID THEY SAY ABOUT THE MATTER?

19       A     I DON'T ENTIRELY RECALL EXACTLY.  BUT

20  BASICALLY I SAID, "WE HAVE A SAFETY CONCERN HERE.  AND

21  I THINK" -- I'M TRYING TO REMEMBER WHAT WAS THE TONE OF

22  THEIR -- THEY SAID, "WELL, WE HAVEN'T SEEN ANY ISSUE

23  YET IN THIS LOCATION."  BUT I THINK THAT THEY BELIEVED

24  THAT THE POTENTIAL WAS THERE.

25       Q     WHY DO YOU THINK THEY BELIEVED THAT?

1          Q    THIS IS WHAT WE MARKED AS EXHIBIT 13.    THIS

2    IS AN ADOPT-A-HIGHWAY SIGN THAT'S LOCATED VERY CLOSE TO

3    THE CHECKPOINT.    SEE, THERE IS THE SIGN FOR THE TRUCKS

4    TO GO HERE?

5               IS THAT SIGN OKAY IN THAT LOCATION, AS FAR AS

6    YOU'RE CONCERNED?

7          A    BASED ON THE DIRECTION THAT I HAVE GIVEN

8    MR. VALLE, AS SOON AS THAT ADOPTEE EITHER LAPSES OR

9    TERMINATES IN THIS LOCATION, WE WILL NOT HAVE THIS

10   LOCATION ONE OF THE ADOPTABLE SEGMENTS AGAIN.

11         Q    THAT'S ON HIGHWAY 15?

12         A    YES.    THE SAME WILL HAPPEN ON INTERSTATE 8,

13   AND STATE ROUTE 94, AND AT THE CHECKPOINT ON I-5 WHERE

14   THE ACTUAL BORDER IS, AND ON STATE ROUTE 905.

15              MR. BENOWITZ:    OFF THE RECORD.

16              (DISCUSSION OFF THE RECORD.)

17   BY MR. FUSELIER:

18         Q    I'VE HANDED YOU AN EXHIBIT THAT WE'RE GOING

19   TO MARK AS NO. 14.    IT IS AN E-MAIL CHAIN.

20              ARE YOU FAMILIAR WITH THIS E-MAIL CHAIN?

21         A    YES.

22         Q    RIGHT ABOUT THE MIDDLE OF THE PAGE IT SAYS,

23   "I WILL CALL YOU TUESDAY BECAUSE WE MAY HAVE MOVE

24   LEVERAGE ON THE MINUTEMEN."

25              DO YOU SEE THAT?

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 1

10

1      Q      THAT ISN'T WHAT I ASKED YOU.  I ASKED YOU IF

2   YOU HAD AN OPINION?

3      A      I DON'T HAVE AN OPINION PROFESSIONALLY.

4      Q      I DIDN'T ASK YOU IF YOU HAD A PROFESSIONAL

5   OPINION.

6      A      I DON'T HAVE AN OPINION.

7      Q      SO YOU HAVE NO OPINION ABOUT THE MESSAGE OF

8   THE SAN DIEGO MINUTEMEN; IS THAT YOUR TESTIMONY?

9             MR. BENOWITZ:  OBJECTION.  ASKED AND

10  ANSWERED.

11     A      YES.

12  BY MR. FUSELIER:

13     Q      HAS ANYBODY DISCUSSED WITH YOU THE ISSUE OF

14  THE MINUTEMEN'S RIGHT TO FREE SPEECH UNDER THE FIRST

15  AMENDMENT?

16             MR. BENOWITZ:  OTHER THAN COUNSEL?

17             MR. FUSELIER:  OTHER THAN COUNSEL.

18     A      I BELIEVE MR. SCHWILK.  AND THERE IS A WHOLE

19  BUNCH OF E-MAILS IN THERE.

20  BY MR. FUSELIER:

21     Q      BAD QUESTION ON MY PART.  LET ME START OVER.

22             HAS ANYONE IN THE DEPARTMENT DISCUSSED WITH

23  YOU THE MINUTEMEN'S RIGHT TO FREE SPEECH UNDER THE

24  FIRST AMENDMENT WITH REGARD TO THIS SIGN?

25     A      I BELIEVE THAT THE ISSUE CAME UP WITH A

                                                   Page 74

1    DISCUSSION THAT I HAD WITH MR. MIKE MILES AND MR. STEVE

2    TAWIAGA.

3         Q    WHO ARE THEY?

4         A    MR. MIKE MILES IS OUR DEPUTY FOR MAINTENANCE

5    AND OPERATIONS OUT OF SACRAMENTO.  AND MR. STEVE

6    TAWIAGA IS THE CHIEF OF THE MAINTENANCE PROGRAM IN

7    SACRAMENTO.

8         Q    IF YOU CAN SPELL THAT NAME FOR THE COURT

9    REPORTER, SHE'LL BE APPRECIATIVE.

10        A    TAWIAGA?

11        Q    YES.

12        A    I WILL DO MY BEST.  I THINK IT IS

13   T-A-W-I-A-G-A.  AND IF THAT'S NOT CORRECT, WE'LL GET

14   YOU THE CORRECT SPELLING.

15        Q    AND WHAT WAS THAT DISCUSSION?  CAN YOU

16   RECOUNT THAT DISCUSSION FOR US?

17        A    BASICALLY, IT WAS AN AFTER-THE-FACT

18   DISCUSSION ON WHETHER OR NOT, YOU KNOW, THE SIGN SHOULD

19   OR SHOULDN'T HAVE GONE UP WHEN THE ORIGINAL REVIEW WAS

20   DONE.  AND IN THEIR OPINION WE HAD NO ABILITY NOT TO

21   ISSUE THE PERMIT BASED ON FREE SPEECH.

22        Q    DID YOU AGREE?

23             MR. BENOWITZ:  OBJECTION.  LACK OF

24   FOUNDATION.

25        A    I MEAN, I UNDERSTAND THE CONCERN.  AND I

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 1

12

1    WOULD SAY, YES.

2    BY MR. FUSELIER:

3        Q    YOU DID AGREE?

4        A    YES.

5        Q    SO I WANT TO GET THE SEQUENCE. YOU SAID,

6    AFTER THE THOUGHT. WAS THIS AFTER THE DECISION TO TAKE

7    THE SIGN DOWN THAT THIS CONVERSATION HAPPENED OR

8    BEFORE?

9        A    NO. THIS WAS -- IT WAS IN BETWEEN THE

10   PERIOD. ONCE THE PERMIT -- ONCE THE SIGN HAD GONE UP;

11   AND ALL OF THE CONTROVERSY SURROUNDED, THAT'S WHEN THIS

12   DISCUSSION OCCURRED.

13       Q    OKAY.  "THIS DISCUSSION" BEING THE FIRST

14   AMENDMENT FREE SPEECH RIGHTS OF THE MINUTEMEN?

15       A    CORRECT.

16       Q    AND THE CONCLUSION WAS THAT INITIALLY THERE

17   WAS NO BASIS TO DENY THE PERMIT BECAUSE OF THE FIRST

18   AMENDMENT RIGHTS OF THE MINUTEMEN; IS THAT RIGHT?

19           MR. BENOWITZ:  OBJECTION.  VAGUE AND

20   AMBIGUOUS.  CALLS FOR A LEGAL CONCLUSION.

21           BUT AS TO YOUR UNDERSTANDING, YOU CAN

22   ANSWER.

23   BY MR. FUSELIER:

24       Q    NO.  I MEAN THE CONVERSATION.  WAS THAT WHAT

25   IT WAS ABOUT?

1    THAT.

2         Q    SO THE SAFETY ISSUE IS DIMINISHED -- OR THE

3    SAFETY THREAT IS DIMINISHED IF THERE ARE LESS CARS

4    GOING BY; IS THAT CORRECT?

5         A    AND YOU DON'T HAVE -- YES.  AND YOU DON'T

6    HAVE A BORDER PATROL CHECKPOINT, AND YOU DON'T HAVE A

7    CHP VEHICLE ENFORCEMENT FACILITY AT THAT LOCATION, AND

8    THE AMOUNT OF HEAVY TRUCKS AND ALL OF THAT ASSOCIATED.

9              MR. BENOWITZ:  COUNSEL, IF I COULD INTERJECT.

10   MR. ORSO-DELGADO, AT THE BREAK, DID WANT TO CLARIFY

11   SOMETHING EARLIER WITH REGARD TO WHEN THE CONVERSATION

12   WITH MR. MILES AND MR. TAWIAGA TOOK PLACE.

13   BY MR. FUSELIER:

14        Q    WELL, WE HAD THAT AGREEMENT.

15        A    AND COUNSEL BELIEVED THAT I HAD STATED OR

16   THAT IT WAS MISUNDERSTOOD THAT IT WAS PRIOR TO THE

17   ERECTION OF THE SIGN.  IT WAS NOT.  IT WAS AFTER.

18        Q    RIGHT.  I UNDERSTOOD.  LET ME JUST TELL YOU.

19   HERE'S WHAT MY UNDERSTANDING OF YOUR TESTIMONY WAS;

20   THAT THE CONVERSATION WITH MR. MILES AND MR. TAWIAGA --

21        A    TAWIAGA.

22        Q    YES -- TAWIAGA OCCURRED AFTER THE SIGN WAS

23   ERECTED AND BEFORE THE CONTROVERSY REALLY GOT UNDERWAY

24   WITH PEOPLE COMPLAINING?

25        A    CORRECT.

1      Q      IT OCCURRED IN THAT TIME FRAME WHICH --

2      A      CORRECT.

3      Q      -- I'M GOING TO ASSUME IS THE END OF

4   DECEMBER, FIRST PART OF JANUARY, CORRECT?

5      A      YES, SIR.

6      Q      AND IT WAS THE RESULT OF PEOPLE INTERNALLY IN

7   THE DEPARTMENT RAISING CONCERNS?

8      A      CORRECT.

9      Q      THAT'S THE WAY I UNDERSTOOD IT.

10      A      FAIR ENOUGH.

11      Q      AND IF IT TURNS OUT THAT THE LOCATION IS --

12   THE NEW LOCATION IS PROBLEMATIC, THEN WE'LL LOOK FOR

13   ANOTHER LOCATION WHICH IS A LITTLE MORE REMOTE; IS THAT

14   FAIR?

15      A      OR -- I WOULDN'T SAY MORE REMOTE, BUT A

16   LOCATION THAT HAS LESS OF A POTENTIAL FOR THIS ISSUE TO

17   HAPPEN. AND LIKE I STATED BEFORE, I DON'T KNOW THAT WE

18   WOULD BE SUCCESSFUL ONE WAY OR ANOTHER. AT THIS POINT

19   IN TIME, YOU KNOW, OUR BEST INTENTION IS THAT THIS

20   LOCATION WOULD BE MORE SUITABLE.

21      Q      AND I USED THE TERM REMOTE. PERHAPS THAT'S

22   NOT A GOOD TERM. LET ME USE A DIFFERENT TERM. YOU

23   WOULD FIND ANOTHER LOCATION WHERE THERE IS LESS

24   TRAFFIC?

25      A      YEAH. ONE COULD SAY THAT. YES.

1      Q    I'M TRYING TO GET THE CRITERIA.

2      A    YES.

3      Q    WE HAVE A PILE OF COMMUNICATIONS WHICH

4  HAVEN'T BEEN MARKED.  AND THESE ARE REALLY E-MAILS AND

5  LETTERS BACK AND FORTH THAT YOU PROVIDED.  AND I HAVE

6  SOME PARTICULAR ONES I WANT TO DISCUSS.  BUT I'M GOING

7  TO MARK THIS GROUP COLLECTIVELY AS NEXT IN ORDER, WHICH

8  IS 15.

9          IN THIS GROUP OF DOCUMENTS THERE ARE A COUPLE

10  OF THEM THAT I'D JUST KIND OF LIKE TO WORK WITH YOU A

11  LITTLE BIT ON.  WHY DON'T YOU REVIEW -- WELL, THIS IS A

12  COMMUNICATION BETWEEN STEVE SAVILLE -- AND IT LOOKS TO

13  ME LIKE IT IS COMING FROM SERGIO --

14          "I SPOKE WITH WILL LAST NIGHT REGARDING THE

15  SIGN ISSUE.  WE'VE RECEIVED WORD THAT THE MEMBERSHIPS

16  OF THE ASIAN, BLACK, AND LATINO CAUCUSES IN THE STATE

17  ASSEMBLY ARE EXTREMELY UPSET ABOUT THE MINUTEMEN ISSUE

18  AND ARE PLANNING TO TAKE US ON."

19          ARE YOU FAMILIAR WITH THIS?

20      A    I REMEMBER THE E-MAIL.

21          (PLAINTIFF'S EXHIBIT 15 MARKED.)

22  BY MR. FUSELIER:

23      Q    "WILL ASKED THE FOLLOWING:  IS LEGAL

24  REVIEWING THE WEBSITE LITERATURE, PUBLICATIONS OF THE

25  ORGANIZATIONS IN DETAIL TO DETERMINE WHETHER THEY HAVE

1    EXPRESSED ANY SORT OF DISCRIMINATION?"  AND QUESTION 2,

2    "IS TRAFFIC OPS REVIEWING THE PROPOSED LOCATION TO

3    DETERMINE WHETHER A SAFETY ISSUE EXISTS OR COULD EXIST

4    RELATED TO THEIR ACTIVITY?"

5         THE RESPONSE IS:  "THE E-MAIL BELOW IS FROM

6    LEGAL AFFAIRS, DIRECTOR RICHARD HARMON."

7         MR. BENOWITZ:  LEGISLATIVE AFFAIRS.

8         THE WITNESS:  LEGISLATIVE AFFAIRS.

9    BY MR. FUSELIER:

10     Q    "LEG AFFAIRS"?

11     A    YEAH.

12     Q    "I WILL NEED YOU TO TAKE A LOOK AT HIS FIRST

13    QUESTION.  THE SECOND IS EASY TO ANSWER SINCE THIS

14    PORTION OF THE HIGHWAY HAS BEEN ADOPTABLE FOR YEARS AND

15    HAS A CLEAN SLATE WITH PAST VOLUNTEERS."

16         THE SECOND QUESTION WAS:  "IS THERE A SAFETY

17    ISSUE?"  IT APPEARS THAT THE CONCLUSION WAS THERE WAS

18    NO SAFETY ISSUE.

19         DO YOU DISAGREE WITH THAT CONCLUSION?

20     A    NO.  AT THE TIME.  AND I MEAN, YOU HAVE --

21    AND WE HAVE STATED -- I HAVE STATED THAT, YOU KNOW, WE

22    HAD PRIOR GROUPS THAT HAVE ADOPTED THIS SEGMENT AND

23    THAT WE HADN'T HAD ANY PROBLEMS.  IT IS THIS SPECIFIC

24    SIGN AND THIS SPECIFIC ISSUE THAT CREATES THE SAFETY

25    CONCERN.

*Enrique Morones <enriquemorones@cox.net>* wrote:
From: "Enrique Morones" <enriquemorones@cox.net>
To: "'Enrique Morones'" <enriquemorones@cox.net>
Subject: PLEASE SEND you own EMAILs TO CALTRANS !!!
Date: Fri, 18 Jan 2008 18:55:43 -0800


Mr Pedro Orso-Delgado
Director CALTRANS
San Diego, CA

Dear Pedro,

As we discuused earlier this week. WE DO NOT WANT SIGNS MOVED TO ANOTHER PART OF FREEWAY AS STATED TODAY BY A HANDFUL OF PEOPLE WE DEMAND MINUTEMEN SIGNS BE REMOVED, PERIOD!

GENTE UNIDA (65 Human Rights Organizations) which originally protested minutemen signage action one week ago today, once again states, WE DO NOT ACCEPT THE SAN DIEGO MINUTEMAN SIGNAGE ANY WHERE. (Along the adopt a freeway program or elsewhere). We clearly stated this point originally and stand firm on this position.

As I stated to you earlier this week that this is not only a freedom of speech issue it is a security issue. Having this signage any where on California's freeways and highways is a major distraction and could attract disruptive actions along those roadways that could be a major safety concern.

There is also the issue of CALTRANS policy to not allow groups that □practice discrimination□ to have signage on ADOPT A FREEWAY program. Today, GENTE UNIDA distributed a document from another of the several coalitions working with us on this issue BORDER HUMAN RIGHTS COALITION, entitled □CREATING THE MINUTEMEN, a small extremist fueled by misinformation□ (by Texas ACLU project) Minutemen are racist hate groups, period.

In the spirit of this weekend and as one on my personal hero□s Rev Martin Luther King Jr. stated □Injustice here, is injustice everywhere□ A minuteman sign here, or anywhere, is injustice everywhere. Minutemen promote hate,  and they, nor there signs, will be tolerated.

Pedro please remove sign.

Paz y mas



Enrique Morones
**Border Angels/Gente Unida**
P.O. Box 86598,
San Diego, CA 92138
www.borderangels.org
(619) 269-7865



EXHIBIT 1

*18*



To    Jeffrey R Benowitz/D11/Caltrans/CAGov@DOT, Glenn B
      Mueller/D11/Caltrans/CAGov@DOT
cc    Pedro.Orso-Delgado@dot.ca.gov
bcc
Subject    Fw: Adopt-a-Highway

The e-mail below is from Leg Affairs Director Richard Harmon. I will need you to take a look at his first
question. The second is easy to answer since this portion of freeway has been "adoptable" for years and
has a clean slate with past volunteers.



STEVE SAVILLE
DIRECTOR, PUBLIC INFORMATION/LEGISLATIVE AFFAIRS
4050 TAYLOR ST., SAN DIEGO, CA 92110
BUILDING ONE, SECOND FLOOR, ROOM 228
(619) 688-6678

----- Forwarded by Steve Saville/D11/Caltrans/CAGov on 01/15/2008 11:34 AM -----

Richard
Harmon/HQ/Caltrans/CAGov         To    Steve Saville/D11/Caltrans/CAGov@DOT
01/15/2008 10:07 AM              cc    Tamie McGowen/HQ/Caltrans/CAGov@DOT
                             Subject    Adopt-a-Highway


I spoke with Will last night regarding this sign issue. We've received word that the memberships of the
Asian, Black and Latino Caucuses in the State Assembly are extremely upset about the Minutemen issue
and are planning to "take us on."

Will asked the following:

- Is Legal reviewing the Web site, literature, publications of the organizations in detail to determine
  whether they have expressed any sort of discrimination?
- Is Traffic Ops reviewing the proposed location to determine whether a safety issue exists (or could
  exist) related to their activity?



EXHIBIT
16    4·8·08

D250 - DELGADO

EXHIBIT 1

19

# EXHIBIT 2

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAN DIEGO MINUTE MEN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CASE NO. 08CV0210 WQH |
| | ) | (RBB) |
| DALE BONNER IN HIS OFFICIAL | ) | |
| CAPACITY AS AGENCY DIRECTOR, | ) | |
| BUSINESS, TRANSPORTATION AND | ) | |
| HOUSING AGENCY; WILL KEMPTON | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| CALTRANS DIRECTOR; PEDRO | ) | |
| ORSO-DELGADO IN HIS OFFICIAL | ) | |
| CAPACITY AS CALTRANS DISTRICT | ) | |
| DIRECTOR AND DOES 1 THROUGH | ) | |
| 50, | ) | |
| DEFENDANTS. | ) | |
| | ) | |


DEPOSITION OF WILLIAM ALAN KEMPTON

SAN DIEGO, CALIFORNIA

MARCH 20, 2008


REPORTED BY: TRACI A. TAYLOR, CSR NO. 10413

VAN DEUSEN REPORTING

(619) 287-0070 - FAX 287-3010


EXHIBIT 2

2∅

1   ISSUE, FROM MY PERSPECTIVE, THAT WE HAD THE PROSPECTS

2   OF A CONFRONTATION THAT MIGHT OCCUR AT THAT LOCATION

3   BETWEEN THE FOLKS THAT WOULD ACTUALLY BE OUT THERE

4   CLEANING UP THE HIGHWAY UNDER THE PERMIT AND OTHER

5   INDIVIDUALS WHO MIGHT DISAGREE WITH THEM, THAT THERE

6   COULD BE POTENTIALLY A PROBLEM WITH PEOPLE TRAVELING BY

7   THE SITE, THROWING OBJECTS AT THE FOLKS ACTUALLY DOING

8   THE LITTER PICKUP, OR SOMEONE JUST STOPPING ALONG THE

9   ROADWAY, WHICH IS A DANGEROUS SITUATION IN AND OF

10  ITSELF, TO CUT DOWN A SIGN THAT HAD THE MINUTEMEN

11  ADOPTION LISTED ON IT.

12      Q    AND WHY DID YOU THINK THAT ANY OF THOSE

13  EVENTS MIGHT OCCUR?

14      A    WELL, I THINK THAT THE ISSUE OF IMMIGRATION

15  IS CERTAINLY, BY MOST REASONED CONSIDERATIONS, AN ISSUE

16  OF SOME CONTROVERSY IN THIS COUNTRY.  AND YOU -- WHEN

17  YOU HAVE ONE COMMUNITY THAT BECOMES PITTED AGAINST

18  ANOTHER COMMUNITY, WHATEVER THE REASON, CERTAINLY

19  CONFRONTATIONS FROM TIME TO TIME DO OCCUR.

20          AND THIS ISSUE OF THE MINUTEMEN'S CONCERN

21  ABOUT IMMIGRATION AND THE FACT THAT THERE WOULD BE

22  SIGNIFICANT TRAFFIC ALONG THAT CORRIDOR, INCLUDING

23  IMMIGRANT TRAFFIC, THAT THERE WAS A RISK OF THAT KIND

24  OF CONFRONTATION OCCURRING.

25      Q    WAS THIS A SUBJECTIVE CONCLUSION THAT YOU

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 2

21

1    CAME TO ON YOUR OWN?

2         A    I WOULD SAY, YES, IT WAS A SUBJECTIVE

3    CONCLUSION.  AND I DID COME TO THAT CONCLUSION ON MY

4    OWN.

5         Q    OKAY.  WAS IT YOUR DECISION TO MOVE THE

6    SIGN?

7         A    YES.

8         Q    WHAT CRITERIA DID YOU USE TO SELECT THE NEW

9    LOCATION?

10             MR. MUELLER:  ASSUMES FACTS NOT IN

11   EVIDENCE.

12             THE WITNESS:  PARDON ME?

13             MR. MUELLER:  ASSUMES FACTS NOT IN EVIDENCE.

14   LACK OF FOUNDATION.

15   BY MR. FUSELIER:

16        Q    THIS IS ONE OF THOSE MOMENTS WHERE YOU ANSWER

17   ANYWAY.

18        A    SO I HAVE TO GO AHEAD AND ANSWER ANYWAY?

19             I DID NOT PERSONALLY USE ANY CRITERIA.  IT

20   JUST SEEMED THAT WE NEEDED TO RELOCATE THAT SIGN TO A

21   LOCATION THAT WAS LESS SIGNIFICANT WITH RESPECT TO AN

22   IMMIGRATION FACILITY IN CLOSE PROXIMITY TO AN AREA OF

23   HIGHWAY ADOPTED BY THE MINUTEMEN GROUP.

24        Q    GOING BACK TO YOUR CONCERNS -- YOUR SAFETY

25   CONCERNS.  WAS IT YOUR THOUGHT THAT THE NAME, SAN DIEGO

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 2
22

1       A    IN THAT INSTANCE.

2            MR. MUELLER:  OBJECTION.  VAGUE.  AND

3    INCOMPLETE HYPOTHETICAL.

4       A    IN THAT INSTANCE, I WOULD AGREE.

5    BY MR. FUSELIER:

6       Q    AND WHEN WE TALK ABOUT THE CIRCUMSTANCES THAT

7    HAVE BEEN SHARED WITH YOU TO SUPPORT THE ALLEGATION

8    ABOUT THE MINUTEMEN AS AN ORGANIZATION, IT HAS TO DO

9    WITH INDIVIDUALS AND THEIR BEHAVIOR MORE THAN WITH A

10   PUBLIC STATEMENT ABOUT PHILOSOPHY BY THE GROUP; IS THAT

11   FAIR?

12      A    I DON'T THINK I WILL COMMENT ON THAT.  I

13   THINK THAT IT CERTAINLY -- THE ALLEGATIONS CERTAINLY

14   REFER TO THE ACTIONS OF A FEW INDIVIDUALS.  WHETHER OR

15   NOT IT WAS REPRESENTATIVE OF THE ORGANIZATION'S

16   PHILOSOPHY, I WOULDN'T COMMENT ON THAT.

17      Q    DO YOU KNOW WHAT THE ORGANIZATION'S

18   PHILOSOPHY IS?

19      A    WE DID IN FACT GO THROUGH INFORMATION

20   RELATIVE TO THE ORGANIZATION, AND I SAW NOTHING IN THE

21   PHILOSOPHY, THE PHILOSOPHICAL STATEMENTS OF ANYTHING

22   THAT I LOOKED AT THAT WOULD HAVE ADVOCATED THAT

23   BEHAVIOR.

24      Q    SEE ANYTHING THAT ADVOCATED RACISM?

25      A    NO.

1     Q   ANYTHING THAT ADVOCATED HATRED?

2     A   NO.

3     Q   AND JUST TO CLOSE THE DOOR, ANYTHING THAT

4   ADVOCATED VIOLENT BEHAVIOR?

5     A   NO.

6     Q   WOULD IT BE FAIR TO SAY THAT THE PURPOSE OF

7   THE LATINO CAUCUS'S MEETING WITH YOU WAS TO EXPRESS

8   THEIR CONCERN THAT THE NAME, THE SAN DIEGO MINUTEMEN,

9   BEING POSTED ON THE SIDE OF THE HIGHWAY WAS CONVEYING A

10   MESSAGE THAT THEY THOUGHT MIGHT OFFEND PEOPLE?

11     A   I CAN'T SPECULATE ON WHAT THEIR PURPOSE WAS.

12   MY OBSERVATION WOULD BE, AFTER GOING TO THE MEETING,

13   THAT THAT WAS CERTAINLY ONE OF THE MESSAGES THAT THEY

14   WANTED TO COMMUNICATE TO ME.

15     Q   AND THEY DID COMMUNICATE IT TO YOU?

16     A   YES.

17     Q   DID THEY COMMUNICATE ANY OTHER MESSAGE TO

18   YOU?

19     A   THE ISSUE OF A PATTERN OF VIOLENT BEHAVIOR,

20   AND A REQUEST THAT WE LOOK INTO THOSE ALLEGATIONS.

21     Q   DID THEY ASK YOU TO MOVE THE SIGN OR TO TAKE

22   THE SIGN DOWN?  THAT'S COMPOUND.  EXCUSE ME.

23         DID THEY ASK YOU TO TAKE THE SIGN DOWN?

24     A   THEIR POSITION WAS TO REMOVE THE SIGN AND TO

25   NOT RELOCATE IT.

1      Q     NOW, THERE WAS A SUBSEQUENT DECISION THAT WAS

2   MADE TO REMOVE -- LET ME RESAY THAT.  THERE WAS A

3   DECISION MADE TO REMOVE THAT SECTION OF THE ROADWAY,

4   THAT WOULD BE THE NORTHBOUND SECTION AT THE IMMIGRATION

5   CHECKPOINT, FROM THE ADOPT-A-HIGHWAY PROGRAM,

6   CORRECT?

7      A     YOU KNOW, I'M NOT CERTAIN THAT THAT DECISION

8   HAS BEEN MADE.  IT WAS DISCUSSED.  BUT I AM NOT AWARE

9   THAT WE HAVE REMOVED THAT SEGMENT FROM THE

10  ADOPT-A-HIGHWAY PROGRAM.

11     Q     IS IT YOUR INTENTION TO DO THAT?

12     A     IT IS NOT MY INTENTION TO DO THAT.  IT WAS

13  DISCUSSED AS POTENTIALLY NOT THE BEST PLACE, FOR OTHER

14  REASONS, PROXIMITY TO SAN ONOFRE, THE BORDER INSPECTION

15  FACILITY WHICH OCCUPIES A PORTION OF IT, THAT MAYBE

16  THAT WAS A BETTER PLACE FOR CALTRANS FORCES TO DO THE

17  MAINTENANCE WORK THAN TO USE IT AS AN ADOPT-A-HIGHWAY

18  PROGRAM.

19           SO THAT -- I SUSPECT IT IS FAIR TO SAY.  IT

20  STILL MAY BE UNDER CONSIDERATION.  I AM NOT AWARE OF A

21  DECISION BEING MADE ON THAT POINT.

22     Q     SO, THEN, AS WE SIT HERE TODAY, THAT PART OF

23  THE HIGHWAY IS AVAILABLE FOR ANOTHER APPLICANT TO

24  REQUEST A PERMIT, ENCROACHMENT PERMIT TO ADOPT THAT

25  PART OF THE ROAD, AS WE SIT HERE NOW, CORRECT?

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

25

1           MR. MUELLER:  CALLS FOR SPECULATION.

2      A    IF IT HASN'T BEEN REMOVED FROM THE

3  ADOPT-A-HIGHWAY ELIGIBLE SEGMENTS OF HIGHWAY, THEN IT

4  WOULD STILL BE AVAILABLE.

5  BY MR. FUSELIER:

6      Q    WOULD YOU KNOW IF IT HAS BEEN REMOVED?  IS

7  THAT SOMETHING THAT WOULD BE PASSED BY YOU, CONSIDERING

8  THIS LITIGATION AND ALL THE THINGS THAT ARE GOING ON?

9      A    YES, I WOULD EXPECT TO KNOW.  AND THE FACT

10 THAT I DON'T KNOW IS AN INDICATION TO ME THAT IT HAS

11 NOT BEEN REMOVED.

12     Q    DO YOU KNOW OF ANY -- LET ME ASK THIS

13 QUESTION.  IF IT WERE TO BE REMOVED, HOW WOULD THAT

14 PROCESS BE UNDERTAKEN?  WHAT'S THE PROCEDURE FOR

15 THAT?

16     A    IT WOULD SIMPLY BE DEEMED AN INELIGIBLE

17 ADOPT-A-HIGHWAY LOCATION.

18     Q    AND IS THAT WITHIN YOUR PURVIEW TO MAKE THAT

19 DETERMINATION?

20     A    YES.

21     Q    ANYBODY ELSE'S PURVIEW?

22     A    I WOULD TRUST A DISTRICT DIRECTOR, SUCH AS

23 MR. PEDRO ORSO-DELGADO, TO MAKE THAT JUDGMENT.  I WOULD

24 TRUST LITERALLY OUR DEPUTY FOR MAINTENANCE AND

25 OPERATIONS TO MAKE THAT JUDGMENT.

1      Q    DID YOU MAKE ANY ATTEMPT TO CONTACT ANYONE IN

2  THE ORGANIZATION, LIKE THE MAN THAT IS LISTED ON THE

3  PERMIT?

4      A    NO.

5      Q    DO YOU KNOW -- OKAY.

6           IF THE PERMIT IS SITE SPECIFIC AND TIME

7  SPECIFIC, HOW -- WHAT ADMINISTRATIVE PROCEDURES ARE

8  USED TO CHANGE THE LOCATION ON THIS PERMIT THAT'S

9  ALREADY ISSUED WITHOUT REVOKING IT?

10     A    MAYBE I CAN BEST ANSWER THAT QUESTION BY

11 GIVING YOU AN EXAMPLE.  MOST OF THE TIME PERMITS OF

12 THIS NATURE ARE REVOKED FOR REASONS OF NONPERFORMANCE.

13 THERE IS A REQUIREMENT THAT THE GROUP EITHER HIRE

14 SOMEONE TO COME IN AND CLEAN THE ROADWAY OR PERFORM

15 THAT SERVICE THEMSELVES AFTER RECEIVING TRAINING.  I

16 BELIEVE THE FREQUENCY IS TWICE A MONTH.

17           AND IF AN AGENCY OR AN ORGANIZATION THAT HAS

18 BEEN GRANTED A PERMIT DOES NOT FULFILL THAT

19 RESPONSIBILITY, THEN WE WILL REVOKE THE PERMIT.

20     Q    OKAY.  BUT IN THIS CASE YOU DIDN'T REVOKE THE

21 PERMIT, DID YOU?  OR DID YOU REVOKE IT?  I DON'T KNOW.

22     A    TECHNICALLY, THAT EXISTING PERMIT WAS

23 REVOKED.

24     Q    OKAY.

25     A    BECAUSE WE FOUND ANOTHER LOCATION AT WHICH A

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

27

1   NEW PERMIT WOULD HAVE BEEN ISSUED HAD THE ORGANIZATION

2   BEEN WILLING TO ACCEPT THAT.

3       Q     ALL RIGHT.  NOW I UNDERSTAND  BECAUSE I WAS

4   A BIT CONFUSED ABOUT THAT.  TECHNICALLY, THE PERMIT HAS

5   BEEN REVOKED; IS THAT FAIR?

6       A     THAT SPECIFIC PERMIT WHICH IS A CONTRACT FOR

7   THAT LOCATION HAS BEEN REVOKED.

8       Q     OKAY.

9       A     WITHOUT PREJUDICE OF THAT WORD.  AND ANOTHER

10  LOCATION ALONG THE STATE HIGHWAY SYSTEM HAS BEEN

11  IDENTIFIED FOR PLACEMENT OF A SIGN AND FOR ASSUMPTION

12  OF THE RESPONSIBILITIES UNDER THE ADOPT-A-HIGHWAY

13  PROGRAM.

14      Q     AND A NEW PERMIT WILL BE ISSUED FOR THAT SITE

15  SPECIFIC, CORRECT?

16      A     EXACTLY.

17      Q     YOU ARE NOT TAKING THE POSITION -- YOU HAVE

18  NOT TAKEN THE POSITION THAT AN ADOPT-A-HIGHWAY SIGN IN

19  ITS GENERIC SENSE IS AN ISSUE NEAR THE CHECKPOINT; IS

20  THAT FAIR?

21      A     I PERSONALLY HAVE NOT COME TO THAT

22  CONCLUSION.  ALTHOUGH, AS WE DISCUSSED PREVIOUSLY,

23  THERE HAS BEEN SOME DISCUSSION THAT THIS LOCATION, FOR

24  OTHER REASONS, NOT RELATED TO THE CASE AT HAND, MAY NOT

25  BE A SUITABLE LOCATION FOR AN ADOPT-A-HIGHWAY

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

28

1        A     A LETTER WAS SENT WHICH DESCRIBED THE

2    REASONS.

3        Q     "FORWARD A REQUEST FOR THE PERMITS

4    CANCELLATION TO THE DISTRICT PERMITS BRANCH.  THE

5    REQUEST MUST INCLUDE THE REASON FOR THE REQUEST.  AND

6    COPIES OF ANY WARNING AND/OR CANCELLATION LETTERS MUST

7    BE ATTACHED."

8              WAS THAT DONE?

9        A     I DO NOT KNOW IF THAT OCCURRED.

10       Q     FOUR, "SUBMIT A WORK ORDER FOR REMOVAL OF THE

11   RECOGNITION PANEL."  THAT'S THE SIGN?

12       A     YES.

13       Q     "NOTE, A CONTRACTOR WHOSE PERMIT HAS BEEN

14   REVOKED" -- WE WON'T GO INTO THAT.

15             HAS THAT BEEN DONE?

16       A     I WOULD ASSUME IT HAS BEEN DONE.  BUT I DO

17   NOT KNOW THAT IT WAS DONE.

18       Q     HAVE YOU BEEN INFORMED THAT THE SIGN HAS BEEN

19   REMOVED?

20       A     YES.

21       Q     SO SOMETHING HAPPENED TO MOVE THE SIGN.

22             ARE YOU AWARE OF ANY OTHER SIGN BEING REMOVED

23   OR RELOCATED BECAUSE OF THE NAME THAT WAS ON THE

24   SIGN?

25       A     I AM NOT

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

29

1      Q      SO THIS IS A UNIQUE EVENT, FAIR?

2      A      FAIR.  LET ME AMEND THAT, IF I CAN.

3      Q      ABSOLUTELY.

4      A      CERTAINLY ON OUR SYSTEM THAT IS THE CASE.  I

5  AM AWARE OF OTHER ACTIONS IN OTHER STATES WHERE SIGNS

6  WERE REMOVED.

7      Q      NO.  I WAS PARTICULARLY INTERESTED IN

8  CALTRANS.

9      A      RIGHT.

10      Q      AND THIS IS AN OPPORTUNITY -- ALTHOUGH WE

11  HAVEN'T HAD THIS ISSUE ARISE, AT ANY TIME THAT YOU NEED

12  TO CLARIFY SOMETHING OR CHANGE --

13      A      DON'T WORRY ABOUT THAT.  I'LL CERTAINLY TELL

14  YOU.

15      Q      MAKE YOURSELF COMFORTABLE WITH THAT.

16             DO YOU REMEMBER THE TERM QUID PRO QUO?

17      A      YES.

18      Q      YOU UNDERSTAND IT IS SOMETHING FOR SOMETHING,

19  IN EXCHANGE?

20      A      THIS FOR THAT.

21      Q      THIS FOR THAT.  EXACTLY.

22      A      FOUR YEARS OF HIGH SCHOOL LATIN.

23      Q      WHAT IS THE QUID PRO QUO BETWEEN THE STATE

24  AND THE ADOPTEE -- OR THE ADOPTER OF THE SIGN FOR THAT

25  SECTION, AS YOU UNDERSTAND IT?

Page 62

1          MR. MUELLER:  LACK OF FOUNDATION.  ASSUMES

2   FACT NOT IN EVIDENCE.  INCOMPLETE HYPOTHETICAL.

3        A    THE QUID PRO QUO AT AN ADOPT-A-HIGHWAY

4   SEGMENT LOCATION?

5   BY MR. FUSELIER:

6        Q    YES.

7        A    THE QUID PRO QUO IS THAT THE STATE RECEIVES

8   THE BENEFIT OF ADDITIONAL RESOURCES TO HELP KEEP THE

9   ROADWAY FREE OF LITTER.  THE RETURN TO THE -- IN RETURN

10  FOR THAT, THE STATE PROVIDES SOME RECOGNITION, VIA A

11  SIGN, FOR THE GROUP THAT IS EITHER PROVIDING OR PAYING

12  FOR THAT SERVICE.

13       Q    THE ROAD GETS CLEANED UP.  THAT'S THE BENEFIT

14  TO THE STATE.  AND WHOEVER IT IS GETS THE PUBLIC

15  AWARENESS OF WHO THEY ARE; IS THAT FAIR?

16       A    YES.

17       Q    WOULD IT BE FAIR TO DESCRIBE THAT AS

18  ADVERTISING FOR THAT NAME?

19       A    I WOULD ASSUME THAT SOME FOLKS THAT DO THIS

20  SERVICE MAY VIEW IT AS AN OPPORTUNITY FOR ADVERTISING

21  IN TERMS OF MCDONALD'S AND THINGS OF THAT NATURE.  FROM

22  OUR PERSPECTIVE, IT IS A RECOGNITION.  IT IS THE FACT

23  THAT YOU ARE RECOGNIZING THE FACT THAT THIS GROUP OR

24  THESE INDIVIDUALS OR WHOEVER ARE PROVIDING THAT

25  SERVICE.

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 2

31

1          Q    RIGHT.  BUT IT WOULD BE A DIFFICULT FICTION

2     TO MAINTAIN TO PRESUME THAT THE PEOPLE WHO DO THIS,

3     LIKE MCDONALD'S, ARE NOT DOING IT FOR THE PURPOSE OF

4     GETTING THEIR NAME OUT IN FRONT OF THE PUBLIC?

5          A    WELL, OF COURSE, I CAN'T SPEAK TO MCDONALD'S.

6     BUT, YOU KNOW, FROM MY PERSPECTIVE, YES.

7          Q    OF COURSE.  IS IT CORRECT THAT CALTRANS

8     INTENDS TO LOCATE A NEW SAN DIEGO MINUTEMEN SIGN ON

9     HIGHWAY 54 IN SANTEE?

10         A    THAT WOULD BE HIGHWAY 52 --

11         Q    52?

12         A    -- IN SANTEE.

13         Q    IN SANTEE.  AND IS THAT A LOCATION THAT WAS

14    APPLIED FOR BY THE SAN DIEGO MINUTEMEN?

15         A    NO.

16         Q    WHAT WAS THE BASIS FOR SELECTING THAT

17    LOCATION FOR A NEW ADOPT-A-HIGHWAY SIGN FOR THE SAN

18    DIEGO MINUTEMEN?

19         A    NO. 1, IT WAS AVAILABLE.  NO. 2, IT IS NOT

20    LOCATED NEAR A FACILITY SUCH AS THE I-5 LOCATION WHICH

21    PROMPTED MY INITIAL CONCERNS.  AND IT IS A SOMEWHAT --

22    IT'S NOT AN INTERSTATE ROUTE, BUT IT IS A FREEWAY

23    SEGMENT.

24         Q    IN YOUR OPINION, WILL THAT NEW LOCATION HAVE

25    LESS VISIBILITY THAN THE PREVIOUS LOCATION?

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

*32*

1    THIS NATURE.  AND THAT WAS THE REASON.

2         Q       NEXT PARAGRAPH    "WE HAVE UP TO 60 DAYS TO

3    FORMALLY DENY AN ENCROACHMENT PERMIT APPLICATION.  I AM

4    HOPEFUL THAT BY THAT TIME THE CHP WILL HAVE CONCLUDED

5    THEIR INVESTIGATION AND WE WILL KNOW WHETHER OR NOT THE

6    GROUP MEETS THE CRITERIA TO PARTICIPATE IN THE AAH

7    PROGRAM."

8              WHAT CHP INVESTIGATION IS BEING REFERRED

9    TO?

10        A       WHEN WE RECEIVED THE ASSERTIONS OR

11   ALLEGATIONS FROM THE LATINO CAUCUS, WE -- I HAD

12   CONVERSATIONS WITH COMMISSIONER BROWN -- THEN

13   COMMISSIONER BROWN, ABOUT HOW WE MIGHT -- OTHER THAN

14   THE INFORMATION THAT HAD BEEN PROVIDED, HOW WE MIGHT

15   DETERMINE IF THERE WAS INDEED A PATTERN OF VIOLENT

16   BEHAVIOR BECAUSE THERE WERE ALLEGATIONS THAT WERE BEING

17   MADE.  WE DID NOT HAVE ANY, YOU KNOW, INFORMATION OTHER

18   THAN WHAT WAS PROVIDED US.  AND SO WE DISCUSSED HOW

19   THAT MIGHT BE ACCOMPLISHED.

20              ONE OF THE POTENTIAL WAYS TO DO THAT WOULD

21   HAVE BEEN FOR THE CHP TO HAVE CONVERSATIONS WITH LOCAL

22   LAW ENFORCEMENT AGENCIES TO SEE IF THERE HAD BEEN ANY

23   ISSUES RELATED TO VIOLENT BEHAVIOR.  SUBSEQUENTLY THAT

24   EFFORT HAS NOT BEEN UNDERTAKEN.  WE'RE STILL DISCUSSING

25   WITH COUNSEL ON HOW WE WOULD PROCEED WITH THAT, IF WE

1    DO IN FACT PROCEED, IF THAT'S THE NATURE.

2        Q    YOU REQUESTED THE DIRECTOR OF THE CHP TO

3    CONDUCT AN INVESTIGATION INTO THE SAN DIEGO MINUTEMEN;

4    IS THAT RIGHT?

5            MR. MUELLER:  MISSTATES HIS TESTIMONY.

6    BY MR. FUSELIER:

7        Q    IS THAT IN ESSENCE WHAT HAPPENED?

8        A    I DON'T THINK I WOULD CHARACTERIZE IT THAT

9    WAY.  I TALKED TO THEN COMMISSIONER BROWN ABOUT HOW WE

10   MIGHT ACCOMPLISH GETTING INFORMATION RELATIVE TO THE

11   ALLEGATIONS THAT HAD BEEN RAISED BY THE LATINO CAUCUS.

12   HE -- IN THE COURSE OF THAT DISCUSSION, HE MENTIONED

13   THAT THERE WAS A LAW ENFORCEMENT GROUP LOCALLY -- LOCAL

14   LAW ENFORCEMENT  INCLUDING CITIES AND COUNTIES, THAT

15   MET REGULARLY, AND THAT ONE WAY TO ACCOMPLISH THAT --

16   IF YOU WANT TO CALL THAT AN INVESTIGATION --

17   ACCOMPLISH -- WAS THERE ANY INDICATION FROM THOSE FOLKS

18   RELATIVE TO A PATTERN OF VIOLENT BEHAVIOR ON THE PART

19   OF THE SAN DIEGO MINUTEMEN.

20       Q    SO YOU REQUESTED AN INFORMAL

21   INVESTIGATION?

22           MR. MUELLER:  MISSTATES HIS TESTIMONY.

23   BY MR. FUSELIER:

24       Q    I MEAN, IT IS GOING TO COME DOWN TO THAT

25   SOMEHOW SOME WAY.  LET'S SEE IF I GOT IT.  YOU GO TO

VAN DEUSEN REPORTING (619) 287-0070
EXHIBIT 2

34

```
 1   THE CHP.  YOU TALK TO THE DIRECTOR.  AND YOU SAY TO

 2   HIM, "I NEED TO KNOW IF THESE PEOPLE ARE VIOLENT.  FIND

 3   OUT FOR ME.  HOW CAN WE DO THAT?"

 4          AND HE SAYS, "WELL, WHAT WE CAN DO IS WE CAN

 5   PUT THE WORD OUT IN THE COMMUNITY AND SEE IF WE GET ANY

 6   FEEDBACK ABOUT THEM."

 7          I MEAN, I KNOW I HAVE SUMMARIZED THAT AND

 8   PARAPHRASED IT, BUT IN ESSENCE, ISN'T THAT WHAT

 9   HAPPENED?

10   A     AND I'M NOT TRYING TO BE EVASIVE HERE, BUT

11   FIRST OF ALL, IT IS VERY APPROPRIATE THAT I WOULD TALK

12   TO THE COMMISSIONER.

13   Q     I NEVER QUESTIONED THE APPROPRIATENESS.

14   A     I UNDERSTAND THAT.  AND, ALSO, IN THE COURSE

15   OF THE CONVERSATION, IT WASN'T A MATTER OF REQUESTING

16   THAT THE CHP DO ANYTHING OR TAKE ANY ACTION.  I ASKED

17   HIM HOW WE COULD ACCOMPLISH A REVIEW OF THESE

18   ALLEGATIONS.  AND HE SUGGESTED THAT A WAY TO DO THAT

19   WOULD BE TO TALK WITH REPRESENTATIVES OF LAW

20   ENFORCEMENT -- OF LOCAL LAW ENFORCEMENT WITH THE

21   PURPOSE OF DETERMINING WHETHER OR NOT THERE WAS ANY

22   HISTORY OR EXPERIENCE THAT WOULD INDICATE A PATTERN OF

23   VIOLENT BEHAVIOR ON THE PART OF THE MINUTEMEN.

24   Q     WE'VE BEEN DOWN THAT ROAD THREE TIMES.  SO

25   THAT HAPPENED --
```

Page 91

1    A    YES.

2    Q    HOWEVER YOU WANT TO CHARACTERIZE IT

3    A    AS I DESCRIBED, YES.

4    Q    AND THEN WHO DID YOU TELL THAT THE CHP WAS

5    INVESTIGATING THE SAN DIEGO MINUTEMEN?

6    A    I DIDN'T TELL ANYBODY THAT THE CHP WAS

7    INVESTIGATING THE SAN DIEGO MINUTEMEN.  THE DISTRICT,

8    INCLUDING THE PUBLIC INFORMATION OFFICER, WAS AWARE

9    THAT I HAD TALKED TO THE CHP.

10    Q    WHY WAS HE AWARE OF THAT?

11    A    BECAUSE I WAS IN TOUCH WITH PEDRO

12    ORSO-DELGADO ON MOST ASPECTS OF THIS PARTICULAR

13    INVESTIGATION.

14    Q    I'M GETTING LOST HERE.  WHO WENT WITH YOU TO

15    SEE MR. BROWN?

16    A    I TALKED TO MIKE BROWN BY TELEPHONE.

17    Q    OKAY.  SO THERE IS NOBODY ELSE PRESENT BUT

18    YOU AND MR. BROWN IN THIS CONVERSATION?

19    A    THAT CONVERSATION, THAT'S TRUE.

20    Q    WAS THERE A SUBSEQUENT CONVERSATION ABOUT

21    THIS ISSUE, THE SAN DIEGO MINUTEMEN?

22    A    I THINK WE HAD A COUPLE OF ADDITIONAL

23    CONVERSATIONS THAT AGAIN FOCUSED ON TIMING OF WHEN WE

24    MIGHT HAVE THAT -- THE MEETING BETWEEN THE LOCAL LAW

25    ENFORCEMENT FOLKS AND THE CHP.

VAN DEUSEN REPORTING (619) 287-0070

EXHIBIT 2

36