1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  SAN DIEGO MINUTEMEN, an
unincorporated association,

12                                          Plaintiff,

13          vs.

14  CALIFORNIA BUSINESS,
TRANSPORTATION AND HOUSING

15  AGENCY'S DEPARTMENT OF
TRANSPORTATION; DALE BONNER, in

16  his official capacity as Agency Director of
the California Business, Transportation and

17  Housing Agency; WILL KEMPTON,
individually and in his official capacity as

18  Caltrans Director; PEDRO ORSO-
DELGADO, individually and in his official

19  capacity as Caltrans District Director; and
DOES 1 through 50,

20
                                          Defendants.
21

CASE NO. 08CV210 WQH (RBB)

ORDER (1) GRANTING IN PART, AND
DENYING IN PART, DEFENDANTS'
MOTION TO DISMISS, AND (2)
GRANTING PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

22  HAYES, Judge:

23          Pending before the Court are Defendants' motion to dismiss (Doc. # 19) and Plaintiff's motion

24  for a preliminary injunction (Doc. # 13). The Court heard oral argument on these matters on Friday,

25  May 9, 2008.

26  /

27  /

28  /

**PROCEDURAL BACKGROUND**

On February 4, 2008, Plaintiff San Diego Minutemen filed a Complaint against Defendants California Business, Transportation and Housing Agency's Department of Transportation (Caltrans); Dale Bonner, Agency Director of the California Business, Transportation and Housing Agency; Will Kempton, Caltrans Director; and Pedro Orso-Delgado, Caltrans District Director. (Doc. # 1). The Complaint alleges that Defendants violated Plaintiff's constitutional rights to free speech, free expression, equal protection, and due process in revoking Plaintiff's Adopt-A-Highway Program permit and removing Plaintiff's Adopt-A-Highway courtesy signs from their location along Interstate 5 at San Onofre, California. (Doc. # 1). In addition, the Complaint asserts claims for damages pursuant to 42 U.S.C. §§ 1983 and 1988. (Doc. # 1).

On February 4, 2008, Plaintiff filed a request for a temporary restraining order. (Doc. # 2). On February 7, 2008, the Court denied the request for a temporary restraining order. (Doc. # 6).

On February 25, 2008, Plaintiff filed the pending motion for a preliminary injunction. (Doc. # 13). On February 27, 2008, Defendants' filed the pending motion to dismiss the Complaint. (Doc. # 19).

**DISCUSSION**

**I. Defendants' Motion to Dismiss (Doc. # 19)**

   **A. Allegations of the Complaint**

Plaintiff San Diego Minutemen is an unincorporated association operating in San Diego, California. *Complaint (Compl.)*, ¶ 1. Plaintiff's organization "promotes adherence to both California and federal immigration laws in a peaceful, non-violent manner," and its mission statement is:

> To demand the maximum border security and immigration enforcement both locally and at the national level. We oppose illegal immigration in all parts of San Diego County with our activism. We assist and support the U.S. Border Patrol in securing the U.S.-Mexican border from terrorists, gang members, criminals, drugs, and illegal aliens entering the United States. We also assist ICE (Immigration & Customs Enforcement) and local law enforcement in exposing law breaking employers and helping to return illegal aliens to their country of legal residence. We act on behalf of and in accord with the United States Constitution and the Bill of Rights.

*Compl.*, ¶ 7.

Defendant Caltrans is the California agency or department in charge of highways and the California Adopt-A-Highway (AAH) Program. *Compl.*, ¶ 4. Defendant Dale Bonner is Director of

1  the California Business, Transportation, and Housing Agency, the state agency which oversees
2  Caltrans. *Compl.*, ¶ 5. Defendant Will Kempton is the Director of Caltrans. *Compl.*, ¶ 6. Defendant
3  Pedro Orso-Delgado is the District Director of Caltrans for the area which is the subject of Plaintiff's
4  Complaint. *Compl.*, ¶ 6.

5         On or about September 18, 2007, Plaintiff applied for an AAH encroachment permit. *Compl.*,
6  ¶ 8. On November 19, 2007, Defendant Caltrans "accepted" Plaintiff into the AAH Program. *Compl.*,
7  ¶ 9 & Ex. 1.  On November 21, 2007, Defendant Caltrans issued Plaintiff a "site specific" AAH
8  encroachment permit for a portion of Interstate 5 near San Onofre, California, designated as AAH
9  Program segment "11-SD-005 / 66.3-68.3 N/B." *Compl.*, ¶ 10 & Ex. 2.  Thereafter, Defendants
10 "erected signs on either side of the San Onofre, Immigration Check Point on the northbound side of
11 Interstate 5," which read "San Diego Minutemen." *Compl.*, ¶ 11 & Ex. 3.

12        In January of 2008, members of Plaintiff's organization picked up trash at their AAH Program
13 "assigned area." *Compl.*, ¶ 12.  "While cleaning up their area," members of Plaintiff's organization
14 wore "Caltrans approved hard hats and safety vests," and there was no "violence," "interaction with
15 motorists," or use of "signs" or "placards." *Compl.*, ¶ 12.

16        On January 28, 2008, Plaintiff received a letter from Defendant Orso-Delgado notifying
17 Plaintiff that "Caltrans was terminating and revoking" Plaintiff's encroachment permit because the
18 permit "raised questions" about safety.  *Compl.*, ¶ 13 & Ex. 5.  The letter stated that Plaintiff's AAH
19 Program courtesy sign would "be removed." *Compl.*, ¶ 13 & Ex. 5.  With respect to safety and the
20 reasons for revocation, the letter noted that,

21        The location of your existing Adopt-A-Highway (AAH) permit has raised questions
          regarding public safety due to the proximity of your assigned highway segment to a
22        U.S. Border Patrol facility that is co-located with the California Highway Patrol (CHP)
          San Onofre Inspection facility.  Your group has also indicated concerns regarding
23        possible vandalism to the courtesy sign displaying your participation in the AAH
          Program and the release of information relative to the days you will perform the
24        required clean up.

25 *Compl.*, Ex. 5.  The letter further noted that Plaintiff's participation in the AAH Program at the
26 location in San Onofre, posed "a significant risk of disruption to the operation of the State highway,
27 as well as public safety concerns for both the traveling public and the participants in the AAH
28 Program." *Compl.*, Ex. 5.

1    In addition to safety concerns, the revocation letter of January 28, 2008, stated that Caltrans

2    was "currently examining allegations of violent behavior and/or advocacy of violence by [Plaintiff's]

3    group." *Compl.*, Ex. 5.  The letter informed Plaintiff that,

> Under the AAH Program eligibility criteria, entities that advocate violence, violation
> of the law, or discrimination based upon race, religion, color, national origin, ancestry,
> physical handicap, medical condition, marital status, age, sex, or sexual orientation
> may not participate in the Program.

*Compl.*, Ex. 5.

On or after January 28, 2008, Defendants removed Plaintiff's AAH courtesy sign from its
location along Interstate 5.  *Compl.*, ¶ 15(3) & Ex. 5.

Plaintiff alleges that Defendants terminated Plaintiff's site-specific AAH Program permit
because "three members of the California Legislature" placed pressure on Defendants to terminate
Plaintiff's permit.  *Compl.*, ¶ 14.  Plaintiff alleges that "the termination of [Plaintiff's] Adopt-A-
Highway sign and requisite privileges and obligations" violated Plaintiff's "First Amendment rights"
because the termination was the result of "content and viewpoint discrimination by Defendants."
*Compl.*, ¶ 15(1).  "Plaintiff contends that the actions of Defendants . . . in terminating Plaintiff's site
specific Adopt-A-Highway location were done arbitrarily, capriciously and based upon the unfettered
discretion given to the Defendants . . . in violation of Plaintiff's constitutional right to free speech and
equal protection under the laws."  *Compl.*, ¶ 15(2).

Plaintiff alleges that Defendants terminated Plaintiff's site-specific permit and removed
Plaintiff's sign without following Defendants' "own policies and procedures," and without allowing
Plaintiff a hearing or an opportunity to "present evidence" in violation of Plaintiff's rights to due
process.  *Compl.*, ¶¶ 15(3), 16.

**B.  Standard of Review**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the pleadings.  *De La
Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).  A complaint may be dismissed for failure to state
a claim under Rule 12(b)(6) where the factual allegations do not raise the "right to relief above the
speculative level." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Conversely, a complaint
may not be dismissed for failure to state a claim where the allegations plausibly show "that the pleader
is entitled to relief." *Id.* (citing FED R. CIV. P. 8(a)(2)).  In ruling on a motion to dismiss pursuant to

1   Rule 12(b)(6), a court must construe the pleadings in the light most favorable to the plaintiff, and

2   further, must accept as true all material allegations in the complaint, as well as any reasonable

3   inferences to be drawn therefrom. *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). In

4   considering a Rule 12(b)(6) dismissal, a court may not look beyond the complaint. *Moore v. Costa*

5   *Mesa*, 886 F.2d 260, 262 (9th Cir. 1989).

6       **C. Analysis**

7       Defendants contend that the Complaint should be dismissed because it fails to state a

8   cognizable claim for relief and is not ripe for review. Specifically, Defendants contend that Plaintiff

9   has not alleged nor suffered harm, and further, that the facts alleged do not violate Plaintiff's

10  constitutional rights to free speech, equal protection, or due process. Defendants contend that

11  Plaintiff's claims pursuant to 42 U.S.C. § 1983 must be dismissed because Plaintiff has not stated a

12  claim for violation  of a constitutional right.

13      Defendant Caltrans contends that it should be dismissed because it is entitled to Eleventh

14  Amendment sovereign immunity. Defendants Kempton and Orso-Delgado contend that they should

15  be dismissed in their individual capacities because they are entitled to qualified immunity. Defendants

16  Kempton, Bonner, and Orso-Delgado contend that they should be dismissed in their official capacities

17  because they are in essence the State, and are therefore entitled to Eleventh Amendment immunity.

18      Plaintiff contends that it has properly asserted claims for violation of its constitutional rights,

19  and notes that this action is ripe because Plaintiff suffered harm as a result of those constitutional

20  violations. Plaintiff contends that the Eleventh Amendment should not bar its claims against Caltrans

21  because there is federal question jurisdiction and not simply diversity jurisdiction. Assuming Eleventh

22  Amendment immunity applies, Plaintiff contends that Defendants Bonner, Kempton, and Orso-

23  Delgado are not immune from suit for declaratory or injunctive relief.

24          *1. Eleventh Amendment Immunity*

25      The Eleventh Amendment to the United States Constitution provides,

26      The Judicial power of the United States shall not be construed to extend to any suit in
        law or equity, commenced or prosecuted against one of the United States by Citizens
27      of another State, or by Citizens or Subjects of any Foreign State.

28  "[F]or over a century," the United States Supreme Court has interpreted the Eleventh Amendment as

precluding jurisdiction in federal courts "over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). The Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction," and it shields a State "save where there has been 'a surrender of this immunity in the plan of the convention.'" *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) (citing *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934)). The Eleventh Amendment immunity shields a State from suits brought by the State's own citizens as well as in suits invoking federal question jurisdiction. *Id.* at 268.[1]

"State immunity extends to state agencies and to state officers, who act on behalf of the state and can therefore assert the state's sovereign immunity." *NRDC v. Calif. Dep't of Transportation*, 96 F.3d 420, 421 (9th Cir. 1996); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003). A State official "sued in his official capacity has the same immunity as the State, and is entitled to Eleventh Amendment immunity." *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992) (citing *Hafer v. Melo*, 502 U.S. 21, 25-26 (1991). Where a plaintiff seeks prospective injunctive relief against a State official in his official capacity, however, the Eleventh Amendment will not bar the prospective injunctive claim. *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md., Inc. v. PSC*, 535 U.S. 635, 645 (2002); *Porter*, 319 F.3d at 491. In addition, the Eleventh Amendment does not bar claims against State officials to the extent those officials are sued in their individual capacities. *Gardner*, 976 F.3d at 473 (citing *Melo*, 502 U.S. at 472-73); *Porter*, 319 F.3d at 491.

Plaintiff's Complaint asserts claims against Caltrans, a State agency, as well as against Caltrans Director Kempton and Caltrans District Director Orso-Delgado in their official and individual capacities. The Complaint further asserts a claim against California Business, Transportation, and Housing Agency Director Bonner in his official capacity.

After reviewing the case law, the Court concludes that Defendant Caltrans is entitled to Eleventh Amendment immunity because State sovereign immunity extends to State agencies and the State of California has not consented to suit in this case. *See NRDC*, 96 F.3d at 421. In addition, the

---

[1] State courts have a "constitutional obligation . . . to uphold federal law," and the United States Supreme Court has expressed its continued "confidence" in the States' ability to do so. *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 275.

Court concludes that Defendant Caltrans is not a person pursuant to 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, Defendants motion to dismiss Defendant Caltrans is hereby GRANTED.

The Court concludes that individual Defendants Bonner, Kempton, and Orso-Delgado are entitled to Eleventh Amendment immunity to the extent that they are sued in their official capacities for money damages. *See Melo*, 502 U.S. at 28-30 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *Gardner*, 976 F.2d at 472. However, because the Complaint includes claims against Bonner, Kempton, and Orso-Delgado for prospective injunctive relief, the Court concludes that the individual Defendants are not entitled to Eleventh Amendment immunity to the extent that they are sued in their official capacities for prospective injunctive relief. *See Verizon Md., Inc.,* 535 U.S. at 645; *NRDC*, 96 F.3d at 422; *Porter*, 319 F.3d at 491. In addition, the Court concludes that Defendants Kempton and Orso-Delgado are not entitled to Eleventh Amendment immunity for claims against them in their individual capacities. *See Gardner*, 976 F.3d at 473; *Porter*, 319 F.3d at 491.

### 2. Ripeness

Defendants contend that this case should be dismissed because it is not ripe for review. Specifically, Defendants contends that the case is not ripe because Plaintiff has not suffered or alleged injury. Defendants contend that Plaintiff was not harmed when Defendants relocated Plaintiff's assigned AAH Program segment to a stretch of State Highway 52 near Santee, California.[2]

Plaintiff contends that this case is ripe for review because Defendants violated Plaintiff's constitutional rights to free speech, equal protection, and due process. Plaintiff contends that Defendants actions in removing Plaintiff's sign without process and in a viewpoint biased manner harmed Plaintiff.

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citing *Thomas v. Union Carbide Agricultural Products, Co.*, 473 U.S. 568, 580-81 (1985)).

---

[2] The Complaint does not allege that Plaintiff's permit was reassigned to another location, and there is no allegation or evidence before the Court which indicates that Defendants have erected Plaintiff's AAH Program courtesy sign at a location along Highway 52.

1    Ripeness requires a court to "'evaluate both the fitness of the issues for judicial decision and the

2    hardship to the parties of withholding court consideration.'" *Texas*, 523 U.S. at 300-301 (citing *Abbott*

3    *Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).  Where a "fair reading" of the Complaint

4    indicates a live controversy and a fully developed factual scenario, a case is considered ripe for

5    review.  *Porter*, 319 F.3d at 490-91.

6        Courts generally resolve controversies premised on First Amendment violations "where

7    speakers are faced with actual restrictions on the content and/or manner of their speech." *Comcast*

8    *v. San Jose*, No. 5:03-cv-02532-RS, 2004 U.S. Dist. LEXIS 26363, *14-15 (N.D. Cal. Aug. 23, 2004)

9    (citing *Porter*, 319 F.3d at 490-91).  Here, the Complaint alleges that Defendants violated Plaintiff's

10    constitutional rights to free speech, equal protection, and due process when Defendants revoked

11    Plaintiff's site-specific AAH permit on the basis of Plaintiff's viewpoint.  The Court concludes that

12    a fair reading of the Complaint indicates that Plaintiff alleges that Defendants have impermissibly

13    restricted Plaintiff's speech.  The Court concludes that a live controversy exists and that resolution

14    of this case does not depend upon "contingent future events that may not occur as anticipated, or

15    indeed may not occur at all." *Texas*, 523 U.S. at 300.  The Court further concludes that the case is fit

16    for judicial review and that Plaintiff could suffer harm if this Court dismisses the suit on ripeness

17    grounds.  *See Assoc. General Contractors of Calif. v. Coalition for Econ. Equity*, 950 F.2d 1401,

18    1412-1413 (9th Cir. 1991) ("[A]n alleged constitutional infringement will often alone constitute

19    irreparable harm."); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2003) (same).

20        Defendants' motion to dismiss on grounds of ripeness is DENIED.

21                *3. Whether the Complaint States Cognizable Claims for Relief*

22        Defendants contend that the Complaint does not state cognizable claims for relief.

23    Specifically, Defendants contend that the Complaint fails to state a claim for violation of Plaintiff's

24    rights to free speech, free expression, equal protection, and due process as a matter of law.  (Doc. #

25    30 at 3-8).  Plaintiff contends that it has properly stated claims for violation of its constitutional rights

26    and for relief under 42 U.S.C. § 1983.

27    /

28    /

1                                a. First Amendment

2          The first question is whether Plaintiff's participation in Defendants' AAH Program involves

3 protected speech or expression. "The First Amendment's prohibition against 'abridging the freedom

4 of speech,'" U.S. CONST. amend I, applies not only to verbal expression, but also to symbolic or

5 expressive conduct that is "sufficiently imbued with elements of communication." *Robb v.*

6 *Hungerbeeler*, 370 F.3d 735, 744 (8th Cir. 2004) (citing *Spence v. Washington*, 418 U.S. 405, 409

7 (1974)); *see Long Beach Area Peace Network v. City of Long Beach*, Case No. 05-55083, 2008 U.S.

8 App. LEXIS 8027, *14-17 (9th Cir. April 15, 2008). The United States "Supreme Court has 'rejected

9 the view that an apparently limitless variety of conduct can be labeled speech whenever the person

10 engaging in the conduct intends thereby to express an idea.'" *Nordyke v. King*, 319 F.3d 1185, 1189

11 (9th Cir. 2003) (citing *Texas*, 491 U.S. at 404).

12          Plaintiff's Complaint alleges that Defendants revoked Plaintiff's site-specific AAH Program

13 permit in violation of Plaintiff's right to free speech and expression. Plaintiff contends that its

14 participation in the AAH Program involved expressive conduct and speech vis-a-vis the AAH

15 Program courtesy signs and Plaintiff's actions in picking up trash on the side of Interstate 5.

16 Defendants contend that participation in the AAH Program does not involve protected speech on the

17 part of an AAH participant. Rather, Defendants contend that the only speech involved in the AAH

18 Program is the State's speech in recognizing AAH Program participants on the AAH Program

19 courtesy signs.

20          Courts which have evaluated a claim for violation of the right to free speech by a participant

21 in an AAH Program have concluded that participation in an AAH program involves protected speech

22 on the part of the AAH participant. *See Hungerbeeler*, 370 F.3d at 744 ("Participation in the AAH

23 program . . . does entail some degree of private 'speech' protected by the First Amendment."); *Cuffley*

24 *v. Mickes*, 44 F.Supp.2d 1023, 1026 (D. Mo. 1999) (same); *Knights of the KKK v. Arkansas St.*

25 *Highway and Transp. Dep't*, 807 F. Supp. 1427, 1435-36 (W.D. Ark. 1992) (same). In addition, the

26 Court of Appeal for the Eighth Circuit specifically rejected Defendants contention here that the only

27 speech involved in a case involving an AAH Program was the speech of the State in installing the

28 AAH courtesy signs on the highway in recognition of the AAH Program participant. *Hungerbeeler*,

370 F.3d at 744.  After reviewing the case law, this Court agrees with those courts which have concluded that participation in an AAH Program involves protected speech and/or expression.  The Court concludes that Plaintiff's participation in the AAH Program is entitled to protections guaranteed by the First Amendment.

The conclusion that Plaintiff's participation in the AAH Program involves protected speech merely begins the inquiry, as "even protected speech is not equally permissible in all places and at all times."  *Cornelius v. NAACP*, 473 U.S. 788, 799-800 (1985).  The Constitution does not require the Government to "freely grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Id.*  "The Court employs a forum analysis to evaluate the nature of the property and the corresponding permissible government limitations on expressive activity."  *DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958, 964 (9th Cir. 1999) (citing *Cornelius*, 473 U.S. at 800)).  "'Forum analysis divides government property into three categories: [traditional] public fora, designated public fora, and nonpublic fora.'"  *DiLoreto*, 196 F.3d at 964 (citing *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir. 1998)).

> Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.  Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest.  Access to a nonpublic forum . . . can be restricted as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.

*Cornelius*, 473 U.S. at 800 (citations and internal quotations omitted).

The Complaint alleges that Defendants terminated Plaintiff's site-specific participation in the AAH Program because of political pressure, the content of Plaintiff's speech, and the viewpoint of Plaintiff's organization.  *Compl.*, ¶¶ 14-15.  The Court concludes that the First Amendment protects Plaintiff's participation in the AAH Program, and further, that the Complaint alleges that Defendants opened Plaintiff's site-specific location as a forum for speech.  For the purposes of the motion to dismiss, the Court concludes that it is not necessary to determine the precise nature of the AAH forum, as such a determination involves a fact sensitive inquiry into the government's intent in opening the forum as well as other factors.  *See Cornelius*, 473 U.S. at 802 (to determine the nature of a forum,

1   a court must consider the intent of the government, the policy and practice of the government, the

2   nature of the property, as well as other factors); *DiLoreto*, 196 F.3d at 965-66.  However, after

3   reviewing the Complaint, the Court concludes that the allegations that Defendants revoked Plaintiff's

4   permit without process and in a viewpoint biased manner plausibly allege a violation of the First

5   Amendment, and put Defendants on fair notice of the First Amendment claim against them.  *See Bell*

6   *Atlantic*, 127 S. Ct. at 1965 (a claim should not be dismissed where the allegations raise the right to

7   relief above the speculative level).

8            Defendants' motions to dismiss Plaintiff's First Amendment claim is DENIED.

9                         b.  Equal Protection

10           The Equal Protection clause of the Fourteenth Amendment provides that "[n]o State shall . .

11  . deny to any person within its jurisdiction the equal protection of the laws."  In this case, Plaintiff

12  alleges that Defendants terminated Plaintiff's site-specific AAH Program permit "arbitrarily,

13  capriciously and based upon the unfettered discretion given to the Defendants" in violation of

14  Plaintiff's right to equal protection.  *Compl.*, ¶ 15(2).

15           Defendants contend that Plaintiff's claim for violation of the right to equal protection must be

16  dismissed because Plaintiff is not a member of a suspect class, cannot articulate a fundamental interest

17  in the AAH Program at any specific location, and the State has a legitimate interest in protecting the

18  safety of the traveling public.  Plaintiff contends that it has properly stated a claim for violation of its

19  right to equal protection because it has alleged that Defendants terminated Plaintiff's AAH permit

20  arbitrarily and in consideration of Plaintiff's viewpoint and position on immigration.

21           As in *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), "the equal

22  protection claim in this case is closely intertwined with First Amendment interests," since Plaintiff's

23  participation in the AAH Program involves protected speech and Plaintiff alleges that Defendants are

24  treating Plaintiff differently because of Plaintiff's viewpoint.  Defendants' motion to dismiss seeks

25  a final determination of Plaintiff's rights to equal protection under the facts of this case, however, the

26  Court concludes that such a determination is not appropriate on a motion to dismiss.  "To survive a

27  motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy

28  only the minimal notice pleading requirements of Rule 8(a)(2)," and that rule "requires only that the

1   complaint include 'a short and plain statement of the claim showing that the pleader is entitled to

2   relief.'" *Porter*, 319 F.3d at 494. The Court concludes that the Complaint plausibly alleges a violation

3   of Plaintiff's right to equal protection, *see Mosley*, 408 U.S. at 95, and puts Defendant on fair notice

4   of the equal protection claim against it.

5          Defendants' motion to dismiss Plaintiff's equal protection claim is DENIED.

6                                    c. Due Process

7          "The requirements of procedural due process apply only to the deprivation of interests

8   encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v.*

9   *Roth*, 408 U.S. 564, 569 (1972). "When protected interests are implicated, the right to some kind of

10  a prior hearing is paramount." *Id.* at 569-70. "To determine whether due process requirements apply

11  in the first place," a court looks to "the nature of the interest at stake," to determine whether the

12  "interest is within the Fourteenth Amendment's protection of liberty and property." *Id.* at 570-71.

13         "'Liberty' and 'property' are broad and majestic terms . . . purposely left to gather meaning

14  from experience." *Id.* at 571. The United States Supreme Court has "made clear that the property

15  interests protected by procedural due process extend well beyond actual ownership of real estate,

16  chattels, or money." *Id.* at 572. Similarly, the Court "has required due process protection for

17  deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." *Id.*

18  Where a State directly impinges upon interests in "free speech," the United States Supreme Court "has

19  on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not

20  the speech . . . interest is clearly protected under substantive First Amendment standards." *Id.* at 575

21  fn. 14.

22         "To state a procedural due process claim, plaintiffs must plead facts that establish: (1) the

23  deprivation of a constitutionally protected liberty or property interest; and (2) the denial of adequate

24  procedural protections." *Good News Emple. Assoc. v. Hicks*, No. C 03-3542 VRW, 2004 U.S. Dist.

25  LEXIS 30371, * 52-53 (N.D. Cal. Mar. 16, 2004) (citing *Brewster v. Bd. of Educ. Of Lynwood Unified*

26  *Sch. Dist*, 149 F.3d 971, 982 (9th Cir. 1988)). In this case, Plaintiff alleges that Defendants revoked

27  Plaintiff's site-specific AAH Program permit in violation of Plaintiff's constitutional right to free

28  speech without allowing Plaintiff a hearing. *Compl.*, ¶ 15(3). Plaintiff further alleges that Defendants

1    terminated Plaintiff's permit pursuant to Defendants' "unfettered discretion," and that Defendants "did

2    not follow their own policies and procedures in removing plaintiff's sign." *Compl.*, ¶ 15(2)-(3).

3         The Court concludes that Plaintiff has pled sufficient facts so as to plausibly allege a violation

4    of its right to due process.  Not only is the right to be free from unconstitutional restrictions on speech

5    a liberty interest protected by due process, *see Bd. of Regents*, 408 U.S. at 575 fn. 14, but the

6    requirements of due process are violated where a law "conditions the free exercise of First

7    Amendment rights on the 'unbridled discretion' of government officials." *Gaudiya Vaishnava Soc.*

8    *v. San Francisco*, 952 F.2d 1059, 1065 (1991) (citing *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

9    750, 756-758 (1988)); *Brewster*, 149 F.3d at 983; *Comcast of Calif. v. City of San Jose*, No. 5:03-cv-

10   02532-RS, 2004 U.S. Dist. LEXIS 26363, *18-21 (N.D. Cal. Aug. 23, 2004).  In addition, the

11   Complaint plausibly alleges a property interest in the AAH program permit itself, which Plaintiff

12   alleges Defendants revoked without process or a hearing, and in violation of Defendants' own policies

13   and procedures.

14        Defendants' motion to dismiss Plaintiff's due process claim is DENIED.

15                                    d. § 1983 Claims

16        In order to state a claim for violation of 42 U.S.C. § 1983, a Plaintiff must allege "(1) that the

17   conduct complained of was committed by a person acting under color of state law; and (2) that the

18   conduct deprived the plaintiff of a constitutional right."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d

19   696, 699 (9th Cir. 1988).

20        The Complaint asserts claims against Defendants Kempton and Orso-Delgado in their

21   individual capacities for violation of Plaintiff's constitutional rights to free speech, equal protection,

22   and due process.  *Compl.*, ¶¶ 18-20.  The Complaint further alleges that Defendants Kempton and

23   Orso-Delgado acted under color of state law.  *Compl.*, ¶¶ 5-6.

24        The Court has previously concluded that the Complaint properly states claims for relief for

25   violations of Plaintiff's constitutional rights.  Accordingly, and because Plaintiff has asserted claims

26   against Defendants Kempton and Orso-Delgado in their individual capacities for actions taken under

27   color of State law, the Court concludes that Plaintiff has properly asserted claims pursuant to 42

28   U.S.C. § 1983.  The Court concludes that Defendants' claim of qualified immunity is more

1   appropriately resolved at summary judgment as opposed to at the motion to dismiss stage of these

2   proceedings.  *See Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999).

3        Defendants' motion to dismiss (Doc. # 19) is GRANTED in part, and DENIED in part as

4   follows.  Defendants' motion to dismiss Defendant Caltrans on Eleventh Amendment immunity

5   grounds is GRANTED.  Defendants' motion to dismiss claims for damages against Defendants

6   Bonner, Kempton, and Orso-Delgado in their official capacities is GRANTED.  In all other respects,

7   Defendants' motion to dismiss (Doc. # 19) is DENIED.

8

9   **II.  Motion For Preliminary Injunction (Doc. # 19)**

10       **A.  Factual Background**

11       Plaintiff San Diego Minutemen is an association whose mission statement is:

12       To demand the maximum border security and immigration enforcement both locally
         and at the national level.  We oppose illegal immigration in all parts of San Diego
13       County with our activism.  We assist and support the U.S. Border Patrol in securing
         the U.S.-Mexican border from terrorists, gang members, criminals, drugs, and illegal
14       aliens entering the United States.  We also assist ICE (Immigration & Customs
         Enforcement) and local law enforcement in exposing law breaking employers and
15       helping to return illegal aliens to their country of legal residence.  We act on behalf of
         and in accord with the United States Constitution and the Bill of Rights.
16
    *Declaration of Jeff Schwilk (Schwilk Decl.)*, ¶ 3.
17
         On September 18, 2007, Plaintiff San Diego Minutemen applied to be part of Caltrans' Adopt-
18
    A-Highway Program.  *Schwilk Decl.*, Ex. 5.  The "Mission and Vision" of the AAH Program is to
19
    "[p]artner with California's citizens to provide motorists with clean and beautiful roadsides," and the
20
    goals of the Program are to "maximize the number of active adoptions," "improve the Department [of
21
    Transportation's] image," and "improve citizens' pride in their communities," among other things.
22
    *Adopt-A-Highway Program Guidelines & Coordinator's Handbook* (Doc. # 19-4 at 1-1).  The AAH
23
    Program is open to "[i]ndividuals, businesses, corporations, and organizations, except for entities that
24
    advocate violence, violation of the law, or discrimination based upon race, religion, color, national
25
    origin, ancestry, physical handicap, medical condition, marital status, age, sex, or sexual orientation
26
    . . . ."  (Doc. # 19-4 at 1-2).
27
         The Adopt-A-Highway Program recognizes participants by erecting courtesy signs on a
28
    participant's adopted highway segment.  (Doc. # 19-4 at 2-1).  With respect to the courtesy signs, the

1  Adopt-Highway Program Guidelines and Coordinators Handbook states that:

2      Although there is advertising value inherent in the recognition panels, they are not
       intended to be an advertising medium.  Their purpose is to recognize who is providing
3      the adoption service, not what service they provide, what products they sell, or where
       they are located.  The Adopt-A-Highway Program and its courtesy signs are not a
4      forum for advertisement or public discourse.

5  (Doc. # 19-4 at 2-1) (emphasis in original).

6          On or around November 19, 2007, Caltrans admitted Plaintiff into the AAH Program, and

7  awarded Plaintiff an AAH encroachment permit.  *Schwilk Decl.*, ¶¶ 4-5.  The encroachment permit

8  identified Plaintiff's litter-removal area as "11-SD-005 PM 66.3-68.3 N/B," which corresponds to an

9  area along Interstate 5 in San Onofre, California.  *Schwilk Decl.*, ¶ 8 & Exs. 3, 5.  Segment 11-SD-005

10  PM 66.3-68.3 N/B is bisected by the San Onofre U.S. Border Patrol checkpoint and California

11  Highway Patrol facility.  *Schwilk Decl.*, ¶ 8 & Exs. 3, 5; *Deposition of Pedro Orso-Delgado* at 10-11.

12  On or around November 19, 2007, Defendants erected one or two courtesy signs at segment 11-SD-

13  005 PM 66.3-68.3 N/B to recognize Plaintiff's participation in the AAH Program.

14          On or around January 15, 2008, members of the Asian, Black, and Latino Caucuses in the

15  California State Assembly informed Defendants that they were "extremely upset" that Plaintiff San

16  Diego Minutemen was allowed to participate in the AAH Program, and noted that the Caucuses were

17  planning to "take [Defendants] on."  *Caltrans Internal E-mail* (Doc. # 31, Ex. 1 at 19);  *Orso-Delgado*

18  *Depos.* at 86.  On or around January 15, 2008, Defendants received an e-mail from Enrique Morones

19  of "Border Angels/Gente United," which "demand[ed]" that Plaintiff's AAH Program courtesy signs

20  be "REMOVED, PERIOD!" and noted that "WE DO NOT ACCEPT THE SAN DIEGO

21  MINUTEMAN SIGNAGE ANY WHERE."  *E-mail From Enrique Morones to Defendant Orso-*

22  *Delgado* (Doc. # 31, Ex. 1 at 18) (emphasis in original); *Orso-Delgado Depos.* at 102-03.  Morones'

23  e-mail characterized Plaintiff as a "racist hate group[]," and noted that having a sign recognizing

24  Plaintiff's group on a freeway was a "major distraction and could attract disruptive actions . . . that

25  could be a major safety concern."  (Doc. # 31, Ex. 1 at 18).  Defendants received other

26  communications from persons and groups opposed to Plaintiff's participation in the AAH Program.

27  *Deposition of William Allan Kempton (Kempton Depos.)* at 10; *Orso-Delgado Depos.* at 37.

28          On or after January 15, 2008, Defendant Will Kempton met with members of the Latino

Legislative Caucus, including Senator Gil Sedillo, Assembly Member Joe Codo, and Assembly Member Lori Saldania, regarding Plaintiff's participation in the Adopt-A-Highway Program. *Kempton Depos.* at 17-18; (Doc. # 32, Ex. 2 at 5). Kempton testified that the members of the Latino Legislative Caucus "expressed concern" that the AAH Program would allow a group which advocates violent behavior to participate, and Assembly Member Saldania noted that members of Plaintiff's organization "intentionally attempted to obstruct community events in her district." *Kempton Depos.* at 18-21; (Doc. # 32, Ex. 2 at 5). In a follow-up letter to Kempton dated January 24, 2008, the Latino Legislative Caucus noted that they would "continue to insist that the history of discrimination and violence by the Minutemen is enough evidence to permanently ban this organization from ever participating in the Adopt-A-Highway Program." (Doc. # 32, Ex. 2 at 5); *Kempton Depos.* at 24.

On or about January 17, 2008, members of Plaintiff San Diego Minutemen collected litter along their assigned portion of Interstate 5 in compliance with the encroachment permit. *Schwilk Decl.*, ¶ 5 & Ex. 2. During the time that Plaintiff's members picked up trash, there was no "commotion or violence." *Schwilk Decl.*, ¶ 5.

On or before January 23, 2008, Defendants Kempton and Orso-Delgado revoked Plaintiff's site-specific AAH Program permit and thereafter removed Plaintiff's AAH Program courtesy signs from Interstate 5. *Orso-Delgado Depos.* at 8-9; *Kempton Depos.* at 14, 18-19, 47; *Schwilk Decl.*, Ex. 7. Orso-Delgado and Kempton each testified at deposition that the intent was to relocate Plaintiff's courtesy signs to another location, however, Orso-Delgado stated that Defendant Caltrans removed Plaintiff's courtesy signs and did not reinstall them at another location. *Orso-Delgado Depos.* at 2; *Kempton Depos.* at 25. With respect to Plaintiff' site-specific AAH Program permit, Defendant Kempton stated at deposition that, "[t]echnically, that existing permit was revoked." *Kempton Depos.* at 47-48.

Pursuant to the California Department of Transportation Adopt-A-Highway Program Guidelines and Coordinator's Handbook, Adopt-A-Highway Program "permits may be cancelled for several reasons, including:"

- Permitee requests cancellation.

- Permit violations.

1    - Site fails to meet current site review criteria.

2    - Majority of site undergoing long-term construction.

3  (Doc. # 19-4 at 3-16).  In addition, the Handbook states the following:

4        Four steps must be taken when cancelling or revoking Adopt-A-Highway
         encroachment permits.  District AAH Coordinators must:
5
6        1.  Inform the Permitee by telephone (or in person) that, effective immediately, they
         may no longer perform Adopt-A-Highway tasks.  An explanation for the action must
         be given.
7
8        2.  Follow up the initial notification with a letter stating why the permit is being
         cancelled and the date that the cancellation became effective.

9        3.  Forward a request for the permit's cancellation to the District Permits Branch.  The
         request must include the reason for the request and copies of any warning and/or
10       cancellation letters must be attached.

11       4.  Submit a work order for removal of the recognition panel.  Note: a contractor,
         whose permit has been revoked, would no longer have legal right to enter the right of
12       way to remove a panel.

13  (Doc. # 19-4 at 3-16).

14       Defendants initially revoked Plaintiff's permit and attempted to relocate Plaintiff's AAH

15  Program courtesy sign because of "safety" concerns.  *Kempton Depos.* at 14.  With respect to those

16  concerns, Kempton stated at deposition that,

17       My concern was, given the volatility of this issue, from my perspective, that we had
         the prospects of a confrontation that might occur at that location between the folks that
18       would actually be out there cleaning up the highway under the permit and other
         individuals who might disagree with them, that there could be potentially a problem
19       with people traveling by the site, throwing objects at the folks actually doing the litter
         pickup, or someone just stopping along the roadway, which is a dangerous situation
20       in and of itself, to cut down a sign that had the Minutemen adoption listed on it.

21  *Kempton Depos.* at 13.  Kempton stated the there was a risk of confrontation on Interstate 5 if

22  Plaintiff's sign remained because of "the Minutemen's concern about immigration and the fact that

23  there would be significant traffic along that corridor, including immigrant traffic . . . ."  *Kempton*

24  *Depos.* at 13.  When asked how "relocating" Plaintiff's sign to another location would alleviate the

25  safety concerns, Kempton stated that, "relocating the sign takes the sign and the Adopt-A-Highway

26  section away from a location which might result in some controversy or controversial acts and puts

27  it on another location of the State highway system where that kind of confrontation is certainly less

28  likely to occur."  *Kempton Depos.* at 25.  Kempton noted that confrontations were less likely to occur

- 17 -                                              08CV210 WQH (RBB)

at other AAH locations when compared to segment 11-SD-005 PM 66.3-68.3 N/B because of the

concentration of "immigration traffic" at segment 11-SD-005 PM 66.3-68.3 N/B, which would be "in

very close proximity to a sign that could inspire some controversy." *Kempton Depos.* at 25. Orso-

Delgado stated that Defendants identified another location for Plaintiff's participation in the AAH

Program on State Route 52, and noted that it was a "better" location "because we don't have the

amount of traffic. We don't have a [California Highway Patrol] facility nor a Border Patrol facility."

*Orso-Delgado Depos.* at 24, 10-11.[3] Orso-Delgado noted that Plaintiff's name on the AAH Program

sign represents Plaintiff's message–a message Orso-Delgado characterized as "want[ing] people to

be here legally"–and indicated that Plaintiff's message was part of a "big debate" which Defendants

did not want to happen "on the side of I-5 where, you know, god forbid, that an accident or anything

like that could happen because of it." *Orso-Delgado Depos.* at 13.

Defendant Kempton made the decision to relocate Plaintiff's sign and characterized that

decision and the conclusion that Plaintiff's sign created safety concerns as "subjective." *Kempton*

*Depos.* at 13-14. When asked to identify the criteria used to select another location for Plaintiff's sign,

Kempton stated, "I did not personally use any criteria." *Kempton Depos*. at 14. Kempton noted that,

> It just seemed that we needed to relocate [Plaintiff's AAH Program courtesy] sign to
> a location that was less significant with respect to an immigration facility in close
> proximity to an area of highway adopted by the Minutemen group.

*Kempton Depos.* at 14. With respect to the decision to revoke Plaintiff's site-specific AAH Program

permit, Defendant Orso-Delgado testified at deposition that there was a procedure in the AAH

Program guidelines for revoking a permit which Defendants followed. *Orso-Delgado Depos.* at 30-

32. However, when asked to identify the procedures at deposition, Orso-Delgado conceded that he

didn't know the procedures. *Orso-Delgado Depos.* at 32-33. When shown a copy of the AAH

Program Guidelines and Coordinator's Handbook, Orso-Delgado admitted that he had never reviewed

it. *Orso-Delgado Depos.* at 37.

On January 28, 2008, Plaintiff received a letter from Defendant Orso-Delgado notifying

Plaintiff that Plaintiff's encroachment permit "is hereby modified," and that "the related courtesy sign

---

[3] According to Orso-Delgado, the traffic at the State Route 52 location is less than the traffic at the San Onofre location along Interstate 5 by about 3 to 1. *Orso-Delgado Depos.* at 24.

will be removed." *Schwilk Decl.*, Ex. 3.  The letter noted that,

> The location of your existing Adopt-A-Highway (AAH) permit has raised questions regarding public safety due to the proximity of your assigned highway segment to a U.S. Border Patrol facility that is co-located with the California Highway Patrol (CHP) San Onofre Inspection facility.  Your group has also indicated concerns regarding possible vandalism to the courtesy sign displaying your participation in the AAH Program and the release of information relative to the days you will perform the required clean up.

*Schwilk Decl.*, Ex. 3.  The letter further noted that Plaintiff's participation in the AAH Program at the location in San Onofre, posed "a significant risk of disruption to the operation of the State highway, as well as public safety concerns for both the traveling public and the participants in the AAH Program." *Schwilk Decl.*, Ex. 3.

In addition to safety concerns, the revocation letter of January 28, 2008, stated that Caltrans was "currently examining allegations of violent behavior and/or advocacy of violence by [Plaintiff's] group." *Schwilk*, Ex. 3.  The letter informed Plaintiff that,

> Under the AAH Program eligibility criteria, entities that advocate violence, violation of the law, or discrimination based upon race, religion, color, national origin, ancestry, physical handicap, medical condition, marital status, age, sex, or sexual orientation may not participate in the Program.

*Schwilk Decl.*, Ex. 3.

On or after January 28, 2008, Defendants removed Plaintiff's AAH Program courtesy signs from their location along Interstate 5 in San Onofre, California.  *Schwilk Decl.*, ¶ 3.  Defendant Kempton stated at deposition that Plaintiff's site-specific AAH Program permit was a "contract" that had been "revoked." *Kempton Depos.* at 47-48.

On or after March 18, 2008, and approximately two or three months after Defendants revoked Plaintiff's site-specific AAH Program permit and removed Plaintiff's courtesy sign from AAH Program segment 11-SD-005 PM 66.3-68.3 N/B, Defendant Orso-Delgado removed section 11-SD-005 PM 66.3-68.3 N/B from the AAH Program altogether. *Orso-Delgado Depos.* at 20-21.  Orso-Delgado concluded that retaining AAH Program segments near U.S. Border Patrol checkpoints and other law enforcement facilities created an unacceptable safety risk given the extra traffic in those areas. *Orso-Delgado Depos.* at 10-11, 24, 70.  Orso-Delgado consulted with Caltrans Chief Deputy of Maintenance and Operations Bill Valle and asked Valle to identify AAH Program segments similarly situated to segment 11-SD-005 PM 66.3-68.3 N/B so that Defendants could remove those

1  segments from the AAH Program.  *Orso-Delgado Depos.* at 21.  At the time of his deposition,

2  Defendant Orso-Delgado knew of other segments in the AAH Program "with similar situations," and

3  testified that those segments would be removed from the AAH Program for safety reasons.  *Orso-*

4  *Delgado Depos.* at 70.[4]  Orso-Delgado testified, however, that segments similarly situated to segment

5  number 11-SD-005 PM 66.3-68.3 N/B–i.e., those segments associated with U.S. Border Patrol

6  checkpoints and other commercial vehicle enforcement facilities–would not be removed from the

7  AAH Program until the current permit lapsed or the adoptee left the AAH Program.  *Orso-Delgado*

8  *Depos*. at 21-22, 69-70, 88.  For example, Orso-Delgado indicated that the south-bound segment of

9  Interstate 5 directly across from segment 11-SD-005 PM 66.3-68.3 N/B would be removed for safety

10  reasons "when the segment lapses."  *Orso-Delgado Depos.* at 22.[5]

11        Orso-Delgado testified at deposition with respect to the reasons and justification for allowing

12  AAH Program participants with permits for locations similar to segment 11-SD-005 PM 66.3-68.3

13  N/B to remain in the AAH Program until their permits lapsed, but requiring Plaintiff to relocate

14  immediately:

15        Q.    What about the other side of the interstate [5] across [from Plaintiff's segment]
              – let's see.  That would be the Southbound side.
16
17        A.    Yes, sir.

18        Q.    Are you going to remove that from the system as well?

19        A.    When the segment lapses, yes, we will.

20        Q.    Well, if it is unsafe, why are you waiting for the segment to lapse?

21        A.    It hasn't created the controversy that [Plaintiff's segment] did.

22        Q.    Okay.  So we're back to the sign – the message of [Plaintiff's] sign creating
              controversy?
23
        A.    Uh-Huh.
24
        Q.    "Yes"?
25

26        [4]  The segments "with similar situations" were variously identified as segments on Interstate
      15, Interstate 8, Interstate 5, State Route 94, and State Route 905.  *Orso-Delgado Depos.* at 21, 70.

27        [5]  At oral argument, Defendants' counsel stated that segments other than segment 11-SD-005
      PM 66.3-68.3 N/B had been removed from the AAH Program, but noted that the current permitees
28    were being permitted to remain until their permits lapsed.  *Certified Transcript of Oral Argument
      Transcript* at 15.

A.    Yes.

*Orso-Delgado Depos.* at 22.

In revoking Plaintiff's site-specific AAH Program permit, Defendants investigated Plaintiff's organization to determine if the organization was discriminatory or violent. *Orso-Delgado Depos.* at 86-87; *Kempton Depos.* at 23-24. During the investigation, Kempton testified that he did not see anything about Plaintiff's organization that advocated "racism," "hatred," or "violent behavior." *Kempton Depos.* at 23-24. In removing AAH Program segment 11-SD-005 PM 66.3-68.3 N/B from the AAH Program, Orso-Delgado was aware that neither the California Highway Patrol nor the AAH Program had encountered any problems at the location previously. *Orso-Delgado Depos.* at 26, 40.[6] Segment 11-SD-005 / 66.3-68.3 N/B "had been adoptable for years and ha[d] a clean slate with past volunteers." *Orso-Delgado Depos.* at 26; (Doc. # 31, Ex. 1 at 19).

**B.  Standard of Review - Motion for Preliminary Injunction**

FED. R. CIV. P. 65(a) provides that the court may issue a preliminary injunction upon notice to the adverse party.

"Preliminary injunctive relief is available to a party who demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *Sammartano*, 303 F.3d at 965 (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)); *see also Preminger v. Principi*, 422 F.3d 815, 822-23 (9th Cir. 2005); *Requa v. Kent School Dist.*, 492 F. Supp. 2d 1272, 1276-77 (W.D. Wash. 2007). "Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties," and in practice, "these two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Sammartano*, 303 F.3d at 965. "[I]n cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Sammartano*, 303 F.3d at 965; *see also Preminger*, 422 F.3d at 823.

---

[6] Orso-Delgado testified at deposition that the California Highway Patrol believed there was a "potential" safety concern if Plaintiff retained the AAH Program location on Interstate 5 at San Onofre because the immigration issue was "polarizing," and there was the potential for "vandalism" and people "pulling off the road." *Orso-Delgado Depos.* at 26-27.

1    "While the basic function of a preliminary injunction is to preserve the status quo pending a

2    determination of the action on the merits, . . . the status quo is not simply any situation before the

3    filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy."

4    *Dep't of Parks & Rec. v. Basaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *see*

5    *GoTo.Com v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("[T]he status quo ante litem

6    refers . . . to the last uncontested status which preceded the pending controversy."). In this case, the

7    last uncontested status which preceded this controversy is that time at which Plaintiff possessed an

8    AAH Program permit and Plaintiff's courtesy signs were displayed at segment 11-SD-005 PM 66.3-

9    68.3 N/B.

10       **C. First Amendment**

11       Plaintiff contends that it is entitled to a preliminary injunction ordering Defendants to reissue

12    Plaintiff's AAH Program permit for segment 11-SD-005 PM 66.3-68.3 N/B and reinstall Plaintiff's

13    AAH Program courtesy signs reading "San Diego Minutemen" because Defendants revoked Plaintiff's

14    permit and removed Plaintiff's courtesy sign unreasonably and in a viewpoint biased manner in

15    violation of Plaintiff's First Amendment rights.

16             1.  Probability of Success on the Merits

17       This Court has already concluded that participation in the AAH Program is "sufficiently

18    imbued with elements of communication" so as to be protected by the First Amendment.  *See supra*

19    Opinion Section I(C)(3)(a); *Hungerbeeler*, 370 F.3d at 744 ("Participation in the AAH program . . .

20    does entail some degree of private 'speech' protected by the First Amendment."); *Cuffley*, 44

21    F.Supp.2d at 1026 (same); *Knights of the KKK*, 807 F. Supp. At 1435-36 (same).  Accordingly, the

22    Court needs to determine the scope of protection which AAH Program participants enjoy in light of

23    the facts of this case.

24       The Constitution does not require the Government to "freely grant access to all who wish to

25    exercise their right to free speech on every type of Government property without regard to the nature

26    of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473

27    U.S. at 799-800.  "In assessing a First Amendment claim relating to speech on government property,

28    the first step is to 'identify the nature of the forum, because the extent to which the Government may

1  limit access depends on whether the forum is public or nonpublic.'" *Sammartano*, 303 F.3d at 965

2  (citing *Cornelius*, 473 U.S. at 797); *DiLoreto*, 196 F.3d at 964. "'Forum analysis divides government

3  property into three categories: [traditional] public fora, designated public fora, and nonpublic fora.'"

4  *DiLoreto*, 196 F.3d at 964 (citing *Children of the Rosary*, 154 F.3d at 976).

5           Because a principal purpose of traditional public fora is the free exchange of ideas,
           speakers can be excluded from a public forum only when the exclusion is necessary
6           to serve a compelling state interest and the exclusion is narrowly drawn to achieve that
           interest.  Similarly, when the Government has intentionally designated a place or
7           means of communication as a public forum speakers cannot be excluded without a
           compelling governmental interest.  Access to a nonpublic forum . . . however, can be
8           restricted as long as the restrictions are reasonable and [are] not an effort to suppress
           expression merely because public officials oppose the speaker's view.
9
10 *Cornelius*, 473 U.S. at 800 (citations and internal quotations omitted); *see also Sammartano*, 303 F.3d

11 at 965.  The Supreme Court has used the term "'limited public forum' to refer to a type of nonpublic

12 forum that the government intentionally has opened to certain groups or to certain topics." *DiLoreto*,

13 196 F.3d at 965.  "In a limited public forum, restrictions that are viewpoint neutral and reasonable in

14 light of the purpose served by the forum are permissible." *Id.*

15          In defining the relevant forum for the purposes of the First Amendment, the focus is on "the

16 access sought by the speaker." *Cornelius*, 473 U.S. at 801; *see also DiLoreto*, 196 F.3d at 965 ("The

17 relevant forum is defined by the access sought by the speaker.").  In this case, Plaintiff seeks

18 reissuance of its site-specific permit to AAH Program segment 11-SD-005 PM 66.3-68.3 N/B and

19 restoration of Plaintiff's AAH Program courtesy signs at segment 11-SD-005 PM 66.3-68.3 N/B.

20 Accordingly, the Court concludes that the relevant forum for the purposes of the First Amendment is

21 AAH Program segment 11-SD-005 PM 66.3-68.3 N/B.[7]

22          "While public places historically associated with the free exercise of expressive activities, such

23 as streets, sidewalks and parks, are considered public fora, not all publicly owned property becomes

24 a public forum simply because the public is permitted to come and go at the site." *Sammartano*, 303

25 F.3d at 966 (internal quotations and citations omitted).  "'The government, no less than a private

26 owner of property, has the power to preserve the property under its control for the use to which it is

27          [7] Plaintiff contended at oral argument that the relevant forum was the entire AAH Program.
28 However, the undisputed facts before the Court show that Plaintiff has not been banned from
   participation in the AAH Program, and it is clear that Plaintiff seeks to be restored at only one location
   within the Adopt-A-Highway Program–segment 11-SD-005 PM 66.3-68.3 N/B.

1  lawfully dedicated.'" *Id.* (citing *United States v. Grace*, 461 U.S. 171, 178 (1983)). "It is the location

2  and purpose of the property and the government's subjective intent in having the property built and

3  maintained, that is crucial to determining the nature of the property for forum analysis." *Id.* (citations

4  omitted).

5          Chapter 2 of the Adopt-A-Highway Program Guidelines and Coordinators Handbook outlines

6  the purpose of the AAH Program and its courtesy signs. (Doc. # 19-4). The Handbook states that the

7  AAH Program courtesy signs are intended to recognize and identify contributors to the AAH Program.

8  (Doc. # 19-4 at 2-1). In addition, the Handbook notes that,

9          Although there is advertising value inherent in the recognition panels, they are not
           intended to be an advertising medium. . . . The Adopt-A-Highway Program and its
10         courtesy signs are not a forum for advertisement or public discourse.

11  (Doc. # 19-4 at 2-1). The Court concludes that Defendants' purpose and intent in creating the AAH

12  Program and segment 11-SD-005 PM 66.3-68.3 N/B was to recognize participants to the public and

13  not to create a traditional or designated public forum.

14          Aside from the State's intent in creating the AAH Program, the Court concludes that the nature

15  and location of segment 11-SD-005 PM 66.3-68.3 N/B weighs against a finding that it is a traditional

16  public or designated public forum. Though there are elements of protected speech and expression in

17  participating in the AAH Program, the nature of that speech and expression is necessarily limited.

18  AAH Program participants must follow strict rules when picking up trash, *see* (Doc. # 19-4 at 8-1 to

19  8-5), and the content and appearance of the AAH Program courtesy signs are strictly regulated–e.g.,

20  "[r]ecognition panel elements are limited to **name, logo, or both** of an adopter." (Doc. # 19-4 at 2-7

21  to 2-10) (emphasis in original). In addition, the goals of the AAH Program–to provide motorists with

22  clean and beautiful roadsides and to maximize adoptions, among other things–do not suggest that the

23  forum requires the freedoms associated with traditional or designated public fora. (Doc. # 19-4 at 1-

24  1). Finally, the location of  segment 11-SD-005 PM 66.3-68.3 N/B on the Interstate 5 freeway near

25  San Onofre, is not as compatible with the nature of expressive activity expected at a traditional public

26  or designated public forum, such as assembly, debating, and protesting, as would be, for instance, a

27  public square or park, because segment 11-SD-005 PM 66.3-68.3 N/B is located on the shoulder of

28  a major freeway with high-speed vehicular traffic. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1078

1    (9th Cir. 2001).

2           After review of the record before the Court, particularly evidence bearing on the State's intent

3    in creating the AAH Program and the location and nature of the forum, the Court concludes that AAH

4    Program segment 11-SD-005 PM 66.3-68.3 N/B is a nonpublic forum. *See Texas v. Knights of the*

5    *Ku Klux Klan*, 58 F.3d 1075, 1078-79 (5th Cir. 1995)[8] (concluding that an AAH Program is a

6    nonpublic forum); *Cuffley*, 44 F. Supp. 2d at 1027 (same); *Robb v. Hungerbeeler*, 281 F. Supp. 2d 989,

7    1000-01 (E.D. Mo. 2003) (same); *see also Preminger*, 422 F.3d at 824 (noting that a Veterans

8    Administration building was a nonpublic forum primarily because the government did not intend to

9    create a public forum).

10          "The test for determining the constitutionality of limitations on speech in a nonpublic forum

11   . . . is the two-part test set forth by the Court in *Cornelius*: Restrictions on free expression in a

12   nonpublic forum are constitutional only if the distinctions drawn (1) are 'reasonable in light of the

13   purposes served by the forum' and (2) are 'viewpoint neutral.'" *Sammartano*, 303 F.3d at 966 (citing

14   *Cornelius*, 473 U.S. at 806).

15                              *a. Reasonableness*

16          "The 'reasonableness' requirement for restrictions on speech in a nonpublic forum 'requires

17   more of a showing than does the traditional rational basis test; i.e., it is not the same as establishing

18   that the regulation is rationally related to a legitimate governmental objective, as might be the case

19   for the typical exercise of the government's police power." *Sammartano*, 303 F.3d at 966-67 (citing

20   *Tucker v. State of Calif. Dep't of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1996)); *Preminger*, 422 F.3d at

21   824. "There must be evidence in the record to support a determination that the restriction is

22   reasonable," in other words, "there must be evidence that the restriction reasonably fulfills a legitimate

23   need." *Id.* "The government need not choose the least restrictive alternative when regulating speech

24   in a nonpublic forum, . . . [h]owever, its failure to select simply available alternatives suggests that

25   the ban it has enacted is not reasonable." *Id.* (citations omitted).

26          Defendants assert two justifications for their decision to revoke Plaintiff's site-specific AAH

27   _____

28       [8] In *Pocatello Educ. Ass'n v. Heideman*, 504 F.3d 1053, 1066 (9th Cir. 2007), the Court of
Appeal for the Ninth Circuit cited with approval the Court of Appeals for the Fifth Circuit's
conclusion that an Adopt-A-Highway Program is a nonpublic forum.

Program permit and remove Plaintiff's AAH Program courtesy signs. The first justification, originally asserted by Defendants in January of 2008, notes that Plaintiff's permit had to be revoked and Plaintiff's courtesy signs had to be removed because Plaintiff's organization "raised questions regarding public safety" due to the proximity of segment 11-SD-005 PM 66.3-68.3 N/B to a "U.S. Border Patrol facility that is co-located with the California Department of Highway Patrol (CHP) San Onofre Inspection facility." *Schwilk Decl.* at Ex. 3. Specifically, Defendants contend that Plaintiff's involvement with immigration–which Defendants characterize as a "polarizing" issue–creates a safety issue with respect to Plaintiff's participation in the AAH Program at segment 11-SD-005 PM 66.3-68.3 N/B because of the traffic near that segment and the fact persons who disagree with Plaintiff's position on immigration might want to vandalize Plaintiff's courtesy signs or create disruptions as a result of seeing Plaintiff's courtesy signs or Plaintiff's members picking up trash. *See Orso-Delgado Depos.* at 11; *Kempton Depos.* at 13. Describing the January, 2008, decision to revoke Plaintiff's permit at deposition, Defendant Kempton noted that,

> My concern was, given the volatility of this issue, from my perspective, that we had the prospects of a confrontation that might occur at that location between the folks that would actually be out there cleaning up the highway under the permit and other individuals who might disagree with them, that there could be potentially a problem with people traveling by the site, throwing objects at the folks actually doing the litter pickup, or someone just stopping along the roadway, which is a dangerous situation in and of itself, to cut down a sign that had the Minutemen adoption listed on it.

*Kempton Depos.* at 13. Kempton further stated the there was a risk of confrontation on Interstate 5 if Plaintiff's sign remained because of "the Minutemen's concern about immigration and the fact that there would be significant traffic along that corridor, including immigrant traffic . . . ." *Kempton Depos.* at 13.

The record establishes that Defendants' first justification for revoking Plaintiff's site-specific permit centers on Defendants' determination that persons opposed to Plaintiff's position on immigration might confront Plaintiff's members on the highway and/or cause disruptions in opposition to Plaintiff's message and thereby create a safety hazard.[9] It is undisputed that (1) on January 17,

---

[9] Kempton stated at deposition, "Well, I think that the issue of immigration is certainly, by most reasoned considerations, an issue of some controversy in this country. And you–when you have one community that becomes pitted against another community, whatever the reason, certainly confrontations from time to time do occur. . . . And this issue of the Minutemen's concern about

2008, Plaintiff's members picked up trash at segment 11-SD-005 PM 66.3-68.3 N/B without incident, and (2) neither of Plaintiff's AAH Program courtesy signs was vandalized while installed at segment 11-SD-005 PM 66.3-68.3 N/B.

As noted by the Court of Appeal for the Ninth Circuit in *Sammartano*, the government may not restrict speech because there may be a negative reaction to that speech by members of the public. 303 F.3d at 969 (citing *Cohen v. California*, 403 U.S. 15, 22-23 (1971); *see also Hungerbeeler*, 370 F.3d at 743. "*Cohen* stands for the proposition that even in light of the purposes of the forum, it is not reasonable to prohibit speech . . . merely because it may offend some people's sense of decorum." *Id.* The record in this case shows that Defendants' fears of highway confrontation and commotion are speculative, and the Court finds that Defendants' justification for restricting Plaintiff's speech "reflects an undifferentiated fear or apprehension of disturbance (which) is not enough to overcome the right to freedom of expression." *Id.* (citing *Cohen*, 403 U.S. at 23). Because Defendants' first justification is centered on Defendants' belief that persons opposed to Plaintiff's organization could create safety issues through violent or disruptive action, the Court concludes that Defendants' first justification is not reasonable in light of *Sammartano* and *Cohen*. *See also Lewis v. Wilson*, 253 F.3d 1077, 1081-82 (8th Cir. 2001) ("[T]he mere possibility of a violent reaction to Ms. Lewis's speech is simply not a constitutional basis on which to restrict her right to speak. . . .The First Amendment knows no heckler's veto.")[10]; *Hungerbeeler*, 370 F.3d at 743 ("The State also may not censor AAH applicants'

---

immigration and the fact that there would be significant traffic along that corridor, including immigrant traffic, that there was a risk of that kind of confrontation occurring." *Kempton Depos.* at 13. When asked if "safety" concerns arose because of "the possible adverse reaction by members of the Latino community and other groups reacting to the message of the Minutemen as to their position on immigration," Defendant Kempton answered, "[t]hat's fair." *Kempton Depos.* at 16-17. Orso-Delgado testified at deposition that the California Highway Patrol believed there might be a safety issue with respect to Plaintiff's participation in the AAH Program at segment 11-SD-005 PM 66.3-68.3 N/B because some persons might react negatively to Plaintiff's participation in the AAH Program. *Orso-Delgado Depos.* at 26-27.

[10] In *Lewis*, the Court of Appeal for the Eighth Circuit evaluated a First Amendment challenge to the State of Missouri's rejection of an application for a personalized license plate which read, "ARYAN-1." *Lewis*, 253 F.3d at 1078. Missouri argued that the rejection was permissible because its concern was "with highway safety rather than the mere offensiveness" of the license plate; specifically, the State noted its concern that the proposed plate could provoke a violent reaction from other motorists. *Id.* at 1081. The Court, however, concluded that any safety concern was a primary, rather than secondary effect, of the message on the plate, and therefore the "safety risk" was not grounds upon which the State could constitutionally restrict speech. *Id.* at 1081-1082; *see also City*

speech because of the potential responses of its recipients, . . . the State's desire to exclude controversial organizations is order to prevent 'road rage' or public backlash on the highways against the adopters' unpopular beliefs is simply not a legitimate governmental interest."); *Hopper*, 241 F.3d at 1079-80 ("Not only was Pasco's policy intrinsically flawed, its enforcement of the policy was, in practice, contingent upon the subjective reaction of viewers of the artwork, as perceived by the city management. Such censorship by public opinion only adds to the risk of constitutional impropriety."). The Court further concludes that the record does not establish that the restriction–revoking Plaintiff's site-specific permit and removing Plaintiff's AAH Program courtesy signs–reasonably fulfills a "legitimate" safety need. *Sammartano*, 303 F.3d at 969. The feared negative reaction to Plaintiff's participation at segment 11-SD-005 PM 66.3-68.3 N/B is speculative, and based on the record before the Court, does not establish a legitimate need for the safety measure imposed.

Defendants' second justification for revoking Plaintiff's site-specific permit and removing Plaintiff's AAH Program courtesy signs, asserted for the first time after Plaintiff filed the Complaint in this case, is that the permit revocation and sign removal were necessary pursuant to Defendants' plan to remove all AAH Program segments near law enforcement facilities from the AAH Program. *See, e.g., Orso-Delgado Depos.* at 21, 69-70 (indicating that the focus was not just on segment 11-SD-005 PM 66.3-68.3 N/B). Specifically, Defendants assert that they had to remove segment 11-SD-005 PM 66.3-68.3 N/B from the AAH Program because it was close to a U.S. Border Patrol checkpoint and created a safety concern because of increased traffic and law enforcement activity near the checkpoint. *Orso Delgado Depos.* at 10-11. Defendants contend that they needed to remove all AAH Program segments near law enforcement facilities because of traffic concerns and safety risks. *See Orso-Delgado Depos.* at 10-11, 24, 70.[11]

The problem with Defendants' second justification is two-fold. First, the justification is not supported by evidence in the record. As noted above, "[t]here must be evidence in the record to support a determination that the restriction is reasonable . . .[t]hat is, there must be evidence that the

_____

*of Erie v. Pap's A.M.*, 529 U.S. 277, 291, 293-296 (2000) (noting difference between primary v. secondary effects of a regulation).

[11] It should be noted that Defendants asserted this second justification at least two months after revoking Plaintiff's permit and removing Plaintiff's courtesy sign. *Orso-Delgado Depos.* at 20-21.

restriction reasonably fulfills a legitimate need." *Sammartano*, 303 F.3d 967.  Here, there is no evidence that traffic concerns at segment 11-SD-005 PM 66.3-68.3 N/B, or near U.S. Border Patrol checkpoints or highway law enforcement facilities generally, have ever caused a safety issue for traveling motorists or AAH Program participants.  In fact, with respect to segment 11-SD-005 PM 66.3-68.3 N/B, the evidence reflects that the segment has been part of the AAH Program "for years" and "has a clean slate with past volunteers."  (Doc. # 31, Ex. 1 at 19).

The second problem with Defendants' justification that safety concerns forced Defendants to remove Plaintiff's segment from the AAH Program pursuant to a plan or policy of removing all AAH Program segments near law enforcement facilities from the AAH Program, is that Defendants have not, in fact, removed all segments of the AAH Program near law enforcement facilities from the AAH Program.  Rather, Defendants have allowed all AAH Program segments near law enforcement facilities, except for Plaintiff's segment, to remain in the AAH Program until the current permitee lapses or leaves the AAH Program.[12]  Plaintiff was not given an opportunity to remain at segment 11-SD-005 PM 66.3-68.3 N/B until its permit lapsed, and it is undisputed that Plaintiff did not voluntarily leave the AAH Program.  There is no evidence before the Court which establishes a difference with respect to safety between segment 11-SD-005 PM 66.3-68.3 N/B and other AAH Program segments near law enforcement facilities.  Accordingly, without identifying a difference between segment 11-SD-005 PM 66.3-68.3 N/B and other AAH Program segments near law enforcement facilities, the facts of this case indicate that Defendants have treated Plaintiff and segment 11-SD-005 PM 66.3-68.3 N/B differently than other similarly situated AAH Program participants and segments.

In addition to the problems noted above, Defendants have not identified any standards which they used to evaluate the safety risks allegedly at issue in this case.  Defendants have not identified a standard for determining when a message is controversial, or how, why or when the controversial message of an AAH Program participant is deemed a safety concern.  Where there are no substantive standards, a court must scrutinize the government's practice "all the more closely for apparent inconsistency or abuse in enforcing the policy."  *Hopper*, 241 F.3d at 1080; *see also Lakewood*, 486

---

[12]  AAH Program permits last five (5) years. *Adopt-A-Highway Program Guidelines & Coordinator's Handbook* (Doc. # 19-4) at 3-7.

U.S. at 758 (noting that without standards, "post-hoc rationalizations . . . and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression"). Here, the rule of *Hopper* and *Lakewood* is particularly applicable, as Defendants have restricted Plaintiff's speech pursuant to a policy requiring removal of all AAH Program segments near law enforcement facilities, but have in practice only removed that segment belonging to Plaintiff from the AAH Program. Furthermore, Defendants did not cite this policy until after this litigation began, *Orso-Delgado Depos.* at 20-21, and have submitted no evidence which would reasonably or legitimately support the need for safety restrictions at or around law enforcement facilities.[13] To the extent that Defendants contend that they removed Plaintiff's AAH Program segment pursuant to a plan or policy requiring removal of all AAH Program segments near law enforcement facilities because of safety concerns, the Court finds that the justification is not supported by the evidence. *Hopper*, 241 F.3d at 1080 (recognizing that courts must be wary of post-hoc distinctions to rationalize inconsistent treatment); *see also Lakewood*, 486 U.S. 758-59 (same).

The Court concludes that neither of Defendants' justifications for the restrictions on Plaintiff's speech and expression are reasonable under the facts of this case.[14] Accordingly, the Court concludes that Plaintiff has a high probability of success on the merits of its First Amendment claim.

### 2. Irreparable Harm and the Balance of the Hardships

"Where plaintiffs seeking a preliminary injunction demonstrate a high probability of success on the merits, they need demonstrate only the possibility of irreparable harm as part of the balancing of the hardships." *Sammartano*, 303 F.3d at 972.

---

[13] Defendants have submitted evidence that there is increased traffic around law enforcement facilities and segment 11-SD-005 PM 66.3-68.3 N/B. However, there is no evidence linking that traffic to safety risks associated with the AAH Program.

[14] The Court notes that "[t]he government has an inherent right to control its property," which generally includes the right "to close a previously open forum." *DiLoreto*, 196 F.3d at 970. However, under the facts of this case, the Court finds that Defendants do not have the absolute right to close segment 11-SD-005 PM 66.3-68.3 N/B pursuant to a general policy requiring closure of all AAH Program segments near law enforcement facilities, when Defendants concede that the policy is only being enforced against Plaintiff and segment 11-SD-005 PM 66.3-68.3 N/B. As noted previously, Defendants' general justification must be closely scrutinized where, as here, the justification is applied selectively to restrict speech and expression. *See Hopper*, 241 F.3d at 1080.

1   "The Supreme Court has made clear that 'the loss of First Amendment freedoms, for even

2   minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance

3   of a preliminary injunction." *Id.* at 973 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also*

4   *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998); *Assoc. Gen. Contractors of Calif.*

5   *v. Coalition for Econ. Equal.*, 950 F.2d 1401, 1412-13 (9th Cir. 1991). Here, Plaintiff has established

6   a high probability of success on the merits of its First Amendment claim, and thus the Court concludes

7   that Plaintiff has established the possibility of irreparable harm. *See Sammartano*, 303 F.3d at 973

8   ("Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment

9   context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the

10  existence of a colorable First Amendment claim."). The Court further concludes that the balance of

11  hardships tip in favor of Plaintiff in this case, because even if the merits of Plaintiff's constitutional

12  claim were not clearly established, the Court concludes that Plaintiff's case would still raise "serious

13  First Amendment questions," which "compels a finding . . . at the very least [that] the balance of

14  hardships tips sharply in [Plaintiff's] favor." *Sammartano*, 303 F.3d at 973 (citing *Viacom Int'l, Inc.*

15  *v. FCC*, 828 F. Supp. 741, 744 (N.D. Cal. 1993)). Defendants have not submitted evidence that they

16  would suffer hardship if the injunction were to issue in this case.

17  The Court concludes that Plaintiff will suffer irreparable harm if the injunction does not issue.

18  3.  The Public Interest

19  A court is required to "examine the public interest in determining the appropriateness of a

20  preliminary injunction." *Sammartano*, 303 F.3d at 974. "The public interest inquiry primarily

21  addresses impact on non-parties rather than parties." *Id.*

22  "Courts considering requests for preliminary injunctions have consistently recognized the

23  significant public interest in upholding First Amendment principles." *Id.* (citing *Homans v.*

24  *Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001); *Iowa Right to Life Comm'e, Inc. v. Williams*, 197

25  F.3d 963, 970 (8th Cir. 1999)). Accordingly, the Court notes that the injunction in this case serves

26  the public interest by protecting Plaintiff's constitutional rights.

27  "The public interest in maintaining a free exchange of ideas, though great, has in some cases

28  been found to be overcome by a strong showing of other competing public interests, especially where

1   the First Amendment activities of the public are only limited, rather than entirely eliminated."

2   *Sammartano*, 303 F.3d at 974-75. Here, Defendants contend that the public's interest in "safety and

3   operational concerns" outweighs any "minimal First Amendment rights laid claim to by plaintiff."

4   (Doc. # 26 at 8). However, the Court concludes that (1) Plaintiff's First Amendment rights are not

5   minimal, but in fact "significant," *see Sammartano*, 303 F.3d at 974, and (2) there is little, if any,

6   evidence to support Defendants' assertion that Plaintiff's participation in the AAH Program at

7   segment 11-SD-005 PM 66.3-68.3 N/B, or the existence of segment 11-SD-005 PM 66.3-68.3 N/B

8   in the AAH Program in the first instance, would endanger the public. The Court concludes that

9   Defendants "have made virtually no factual showing, on the current record, to support the claimed

10  need" for the restrictions imposed on Plaintiff's speech. *See Sammartano*, 303 F.3d at 975.

11        After reviewing the record, the Court concludes that the public interest favors imposition of

12  an injunction in this case.

13        Plaintiff has established a high probability of success on the merits, the potential for irreparable

14  harm, and that the balance of hardships tips sharply in Plaintiff's favor. The Court further concludes

15  that the public interest favors imposition of the injunction and the protection of First Amendment

16  freedoms under the facts of the case before the Court at this time. Notwithstanding those conclusions,

17  Defendants contend that an injunction should not issue under the facts of this case because Plaintiff

18  seeks a mandatory injunction, which is "subject to a heightened scrutiny and should not be issued

19  unless the facts and the law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d

20  1399, 1404 (9th Cir. 1993); *see also Stanley v. U.S.C.*, 13 F.3d 1313, 1320 (1994).

21        The parties dispute whether Plaintiff seeks a mandatory injunction. A mandatory injunction

22  is often juxtaposed with a prohibitory injunction, where a prohibitory injunction is defined as

23  something which "preserves the status quo," while a mandatory injunction is defined as an injunction

24  that "goes well beyond simply maintaining the status quo pendente lite . . . ." *Stanley*, 13 F.3d at1320.

25  Plaintiff seeks to preserve the status quo ante litem–"the last uncontested status that preceded the

26  parties' controversy"–while a mandatory injunction is defined with respect to the status quo pendente

27  lite–the status quo pending suit. *GoTo.Com*, 202 F.3d at 1210; *Stanley*, 13 F.3d at 1320. When

28  considered in light of *Stanley's* distinction between mandatory and prohibitory injunctions, the

heightened scrutiny afforded requests for mandatory injunctive relief makes sense because in effect a mandatory injunction changes the position of the parties as opposed to preserving the status quo. However, the Court of Appeal for the Ninth Circuit has recently stated that "the basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits," and defined "the status quo" as "not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy." *Dep't of Parks & Rec.*, 448 F.3d at 1124. Given the Court of Appeals' most recent pronouncement on the issue, the Court concludes that Plaintiff's injunctive request should not be considered mandatory as that term is used in *Stanley* because Plaintiff is simply invoking the basic purpose of a preliminary injunction, and thus should not be subject to heightened scrutiny. However, the Court concludes that even under the heightened standard of a "mandatory" injunction, Plaintiff has established that the "facts and law clearly favor" granting the injunction in this case. *See Dahl*, 7 F.3d at 1403. Plaintiff has established a high probability of success on the merits, that it will suffer irreparable harm, that the balance of hardships tips sharply in its favor, and that the public interest favors the injunction.

Plaintiff's motion for a preliminary injunction (Doc. # 13) requiring that Defendants reinstate Plaintiff's permit for AAH Program segment 11-SD-005 PM 66.3-68.3 N/B and reinstall Plaintiff's courtesy signs during the pendency of this litigation is GRANTED.

### CONCLUSION

Defendants' motion to dismiss (Doc. # 19) is GRANTED in part, and DENIED in part. Defendants' motion to dismiss Defendant California Business, Transportation and Housing Agency's Department of Transportation (Caltrans) on Eleventh Amendment Grounds is GRANTED. Defendants' motion to dismiss claims for damages against Defendants Bonner, Kempton, and Orso-Delgado in their official capacities is GRANTED. In all other respects, Defendants' motion to dismiss is DENIED.

Plaintiff's motion for preliminary injunction (Doc. # 13) requiring that Defendants reinstate Plaintiff's permit for AAH Program segment 11-SD-005 PM 66.3-68.3 N/B and reinstall Plaintiff's courtesy signs during the pendency of this litigation is GRANTED. Defendants shall reinstate Plaintiff's permit for AAH Program segment 11-SD-005 PM 66.3-68.3 N/B and reinstall Plaintiff's

1 | courtesy signs within thirty (30) days of this Order.

2 | **IT IS SO ORDERED**.

3 | DATED:  June 27, 2008

4 | *William Q. Hayes*

5 | **WILLIAM Q. HAYES**
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28